IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:15-CV-187-H

THOMAS CANNON, JESSE CONNER, )
DONALD KOONS, and NICHOLAS )
TERRELL, )
    Plaintiffs, )
  )
    v. )
  )
VILLAGE OF BALD HEAD ISLAND, )     **ORDER**
NORTH CAROLINA, CALVIN R. )
PECK, JR., in his individual )
capacity, and CAROLINE )
MITCHELL, in her individual )
capacity, )
    Defendants. )

This matter is before the court on Defendant Mitchell's Motion
for Summary Judgment, [D.E. #38]; Defendants Peck and Village's
Motion for Summary Judgment, [D.E. #44]; plaintiffs' Motion for
Oral Argument in Opposition to the motions for summary judgment,
[D.E. #52]; and plaintiffs' Motion for Extension of Time to Respond
and Extend Length, [D.E. #66]. Plaintiffs have responded, [D.E.
#55], and the time for further filing has expired. This matter is
ripe for adjudication.

## PROCEDURAL HISTORY

Plaintiffs filed a complaint on August 26, 2015, alleging
seven claims for relief arising from their termination as police
officers employed by the Village of Bald Head Island ("Village").
Defendants Peck, Mitchell, and Village filed a Partial Motion to

Dismiss on October 30, 2015, [D.E. #20]. This court entered an order on September 22, 2016, [D.E. #34], dismissing plaintiffs' claims in part.[1]

Now before the court are defendants' motions for summary judgment, plaintiffs' response, each parties' notice of subsequently decided authority, [D.E. #65, #68], as well as plaintiffs' motion for oral argument and motion for extension of time and length of response.

## STATEMENT OF FACTS[2]

Plaintiffs were public safety officers employed by Defendant Village whose employment was terminated August 28, 2014. Village is a municipality located in Brunswick County, North Carolina. Defendant Peck was the Town Manager and Defendant Mitchell was the Director of Public Safety for Defendant Village at all times relevant to the complaint.

On August 28, 2014, Scott Anderson, a member of command staff in the Department of Public Safety, summoned Plaintiff Terrell, a lieutenant of public safety, to a meeting with Defendants Peck and Mitchell. [D.E. #55-4 Terrell Dep. at 19]. Scott Anderson also

---

[1] The court dismissed the claim of wrongful discharge against Defendants Peck and Mitchell in their individual capacities; all claims of violations of the North Carolina Constitution against Defendants Peck and Mitchell in their individual capacities; the claim of 42 U.S.C. § 1983 violation of the right to privacy under the United States Constitution against Defendants Peck and Mitchell in their individual capacities on the basis of qualified immunity; and Plaintiffs Cannon, Koons, and Terrell's direct free speech claims under the North Carolina Constitution against Defendant Village.

[2] The facts are construed in the light most favorable to the plaintiff who is the non-moving party to the instant Motions for Summary Judgment.

2

summoned Plaintiffs Conner and Koons, officers of public safety, to a meeting with Defendants Peck and Mitchell. [D.E. #55-2 Conner Dep. at 35; D.E. #55-3 Koons Dep. at 28-29]. At both meetings, Defendants Peck and Mitchell notified plaintiffs of their immediate termination from employment as lieutenant and public safety officers, respectively, at Defendant Village. Plaintiff Conner was a contract employee with over one year remaining on his contract. Defendants Peck and Mitchell called Plaintiff Cannon, a lieutenant of public safety, and terminated him for cause by a telephone call on August 28, 2014. [D.E. #55-1 Cannon Dep. at 27]. Defendant Mitchell called Plaintiff Cannon the day before and told him to come to the office the following day, but Plaintiff Cannon told her he was unable to come the following day. Each of the four plaintiffs was provided a letter of termination signed by Defendant Peck informing each Plaintiff his termination was based on participation in a series of text message communications between July 25, 2014 and August 15, 2014, in violation of varying policies of Defendant Village. Additionally, each of the four plaintiffs were informed his termination was a "final decision." [D.E. #55-8 Aff. Terrell at 1; D.E. #55-4 Terrell Dep. at 30; D.E. #55-6 Aff. Conner at 1; D.E. #55-2 Conner Dep. at 34-35; D.E. #55-7 Aff. Koons at 1; D.E. #55-3 Koons Dep. at 29-30; D.E. #55-5 Aff. Cannon at 1; D.E. #59-8 Termination Notes].

3

All four of plaintiffs' termination letters listed violations of Village policies related "to discourteous treatment of other employees, (Article IX), and inappropriate electronic communications (Article IX)." [D.E. #1-4 Termination Ltr Terrell at 1; D.E. #1-2 Termination Ltr Conner at 1; D.E. #1-3 Termination Ltr Koons at 1; D.E. #1-1 Termination Ltr Cannon at 1]. Termination letters for Plaintiffs Terrell, Koons, and Cannon stated termination was also based on violations of Village policies related to harassment "(Article V: Conditions of Employment and Article IX)." [D.E. #1-4; D.E. #1-3; D.E. #1-1]. Termination letters for Plaintiffs Terrell and Koons included violations of Village policy related to sexual harassment (Article V: Conditions of Employment and Article IX)." [D.E. #1-4; D.E. #1-3]. Termination letters for Plaintiffs Terrell and Cannon additionally provided that Village "has no tolerance for harassment and especially those in leadership positions are expected to not only abide by policy, but to assist in upholding the principles and policies of the Village." [D.E. #1-4; D.E. #1-1].

Following the listing of policy violations, each letter stated, "The egregious nature of these communications and the flagrant violation of policy thus constitutes detrimental personal conduct and is thereby grounds for immediate termination." [D.E. #1-1; #1-2; #1-3; and #1-4]. The text message exchange at issue occurred over six days as follows:

4

Friday, July 25, 2014

Plaintiff Cannon:    Sammy getting his hands dirty! Of course there was a young female involved.

Plaintiff Cannon:    [image containing person working on a bike]

Plaintiff Conner:    Oh I wouldn't imagine otherwise. Did he just get out some tools and act like he knew what he was doing[,] then ask [T]ommy [T] to really fix it[?]

Dave LaPlante:       Would not expect anything different.

Sam Proffit:         Hahaha

Plaintiff Conner:    That was his way into what he does best. [Expletive].

Sam Proffit:         Once again[,] while I am doing all the work, here is [T]om.

Sam Proffit:         [image containing picture of two men standing beside children sitting down]

Sam Proffit:         Always making his way infront [sic] of the camera.

Plaintiff Conner:    Tommy [T] does have a way of sneaking into the lime light. He likes to show off[.]

Plaintiff Conner:    Tom knew Sammy couldn't fix that bike. He just wanted to sit back and watch him struggle. He's got a twisted sense of humor.

Dave LaPlante:       Tom was not at lunch yet. Must have been taken before 11:15.

Nick Hiatt:          If we were still able to go to the peli[,] [T]om wouldn't even of [sic] been here.

Jeff Sypole:         If you want a good picture of [T]om[,] you have to find him between the hours of 8am-1130 am and 2pm-7pm[.]

5

Jeff Sypole:        I'm sure [T]om pawned that bike fix off
                    on Sam because there was a chan[c]e of
                    getting dirty fingers[.]

Plaintiff Conner:   Neither one likes to get dirty. But Sam
                    will only do it if it involves showing
                    off to the opposite sex. Tom will do it
                    if he has to[,] but he's like a
                    [expletive] wet cat for the rest of the
                    day [sic] [g]rooming himself[.]

Sam Proffit:        And Jesse only does it to show off for
                    the same sex.

Jeff Sypole:        At least I only have 2 more weeks of
                    list[en]ing to this :)

Jeff Sypole:        [image of man containing the following
                    words] "YOU WANT US TO THINK NOTHING OF
                    YOU GOING TO COLORADO FOR CPR TRAINING?
                    YOU JUST WENT FULL RETARD.]

                        Wednesday, August 6, 2014

Plaintiff Terrell:  Hahaha

Plaintiff Koons:    Good one[.]

Herbert Bryant:     You got to read the state port pilot
                    piece on dps.

Jeff Sypole:        Where do I find it?

Herbert Bryant:     All over southport.  You can't read it
                    online if you arent [sic] subscriber.

Jeff Sypole:        I was trying to look online.

12526227939:        What is DPS?

Herbert Bryant:     Department of public safety[.]

Herbert Bryant:     Us dimwit[.]

Plaintiff Koons:    What does its day [sic]

Plaintiff Koons:      Sau [sic] [.]

12526227939:          I'm new, I'm new[.]

Herbert Bryant:       You can't get it online. Unless you are
                      a member.

Plaintiff Conner:     Hey. If everyone but two are all 4 certs
                      then why are only a hand full [sic] of
                      the staff doing ems fire and water
                      rescue?

Plaintiff Conner:     I like how were [sic] worried about
                      sending people to county check points but
                      not worried that people who claim to be
                      ems can't take a blood pressure.  Or not
                      worried about doing first in engine
                      drills or even sending guys who have no
                      real fire experience at least to a
                      controlled training burn.

Plaintiff Terrell:    I was just thinking that the other day,
                      he only sends out LEO training, he's the
                      training guy it needs to be all 3
                      equally.

Plaintiff Terrell:    '[Expletive] it I will call rich burns

Jeff Sypole:          [Expletive] it I quit.

Herbert Bryant:       [Expletive]. I'm getting good at this
                      twittering[.]

Jeff Sypole:          Take pictures of it and send them[.]

Herbert Bryant:       Caroline says all but two staff are
                      certified in fire law SMS [sic] and
                      water[.]

Herbert Bryant:       SMS=SMS[.]

Plaintiff Terrell:    Send the link[.]

Herbert Bryant:       [Expletive].

Herbert Bryant:       Ems[.]

Plaintiff Terrell:      Technologically retarded[.]

Jeff Sypole:            I can think of at least 4 people not being
                        all 3, her being one, a captain is one,
                        and 2 staff members.   And if you count
                        seasonal that makes 8.   Plus add in the
                        fact that they are short at least 2
                        officers.   As Herbie said, fear and
                        lies[.]

Jeff Sypole:            Actually more… Mo, Sam, Courtney,James
                        [H]unter, Caroline, Paul[,] and DJ are
                        all short at least 1 of the 3[.]

12526227939:            Maybe she just can't count[.]

Herbert Bryant:         What makes the statement truly awesome is
                        that [sic] in the picture they use for
                        the article.   In the picture:  Sam,
                        Courtney, Paul, James, Scott, and Matt[.]

Jeff Sypole:            Maybe she is going to Colorado for a math
                        class, or maybe they are just complete
                        liars[.]

Jeff Sypole:            [Image of animal with following words]
                        KNOCK KNOCK HERE COMES THE COCK[.]

Plaintiff Conner:       That looks like Dj [sic] with a five o
                        clock shadow.

Plaintiff Koons:        In Colorado u [sic] do not need certs u
                        [sic] do what ever [sic] u [sic] want
                        just like bald head [sic][.]

Herbert Bryant:         I wish the water rescue class I took was
                        a certification class[,] someday I will
                        have all four certs[.]

Plaintiff Koons:        Hey now Iam [sic] taller than that lol[.]

Plaintiff Terrell:      New water rescue gear, not shown but
                        there will be cheetah print also!!!

Plaintiff Terrell:      [image of Speedo-type swimwear]

Plaintiff Koons:        [Expletive] [M]o already has these[.]

8

12526227939:        You guys can try mine on so you'll get
                    the right size.

Plaintiff Conner:   Sam has em [sic] to [sic] I saw when he
                    was changing into his wrestling singlet
                    to work out.  He has one of those built
                    in pumps in the crotch region though like
                    on dodge ball.

Plaintiff Koons:    Do u [sic] have extra small[?]

12526227939:        It's short but at least it's skinny
                    too[.]

Jeff Sypole:        I don't think [M]o's will fit well, too
                    small in the front and too big in the
                    rear[.]

Jeff Sypole:        I'll have to wear [M]o's backwards[.]

Plaintiff Conner:   He does have a gorgeous [expletive]
                    though.

12526227939:        Hahaha

12526227939:        You [expletive][.]

12526227939:        You [expletive][.]

12526227939:        Hahaha

Herbert Bryant:     The room startin [sic] to spin real [sic]
                    fast [sic] cuz [sic] of the gayness[.]

Jeff Sypole:        Then leave and it will stop[.]

Plaintiff Conner:   Ohhh burn.

                    Thursday, August 7, 2014

Plaintiff Terrell:  Who's goin [sic] to the checkpoint  huh
                    huh huh come on I need a response[.]

Plaintiff Terrell:  How about some fire or EMS training[?]

Plaintiff Conner:   Yeah how [a]bout it

                              9

Jeff Sypole:         I'm going, to drive through it drunk[.]

Plaintiff Terrell:   Haha[.]

Plaintiff Conner:    I'll go if I can wear full tactical gear
                     and a gulley suit. Jump out of the bushes
                     at people.

Plaintiff Conner:    Ah ha, I gotch [sic] yo [sic]
                     [expletive].

Jeff Sypole:         Easy Scott Jr.

Plaintiff Conner:    Oh yeah. I definitely need to have a
                     samurai sword. If I can't bring one[,]
                     I'm not going.

Plaintiff Terrell:   I'm not going unless I get to take the
                     assault rifle.

Jeff Sypole:         [image containing man sitting at desk
                     with the following words] "I AM NO
                     WEATHER MAN, BUT THE COMMAND STAFF CAN
                     EXPECT A FEW INCHES TONIGHT."

Jeff Sypole:         [image containing same picture of man
                     sitting at desk with the following words]
                     "I AM NOT SAYING I WANT TO BE A LT, BUT
                     IF [EXPLETIVE] HAD WINGS, MY MOUTH WOULD
                     BE AN AIRPORT."

Nick Hiatt:          It's not a LT anymore. He will never be
                     like you! I think it is SGT now.

Plaintiff Terrell:   The funniest [expletive] I've ever
                     seen[.]

Jeff Sypole:         [image containing the following words]
                     "JEESE'S LT INTERVIEW WENT WELL"

Plaintiff Terrell:   Haha[.]

Plaintiff Koons:     Think he upgraded to capt[.]

Plaintiff Koons:    He has been in the office all day taking a pounding[.]

Plaintiff Conner:   You spelled my name wrong.  Get it right for [expletive].

Jeff Sypole:        Better.

Jeff Sypole:        [image containing the following words] "JESSE'S LT INTERVIEW WENT WELL"

Friday, August 8, 2014

Plaintiff Koons:    [image containing DPS article entitled "Officers need multiple skills"]

Sunday, August 10, 2014

Jeff Sypole:        [image of an officer character containing the following words] "ONLY TWO OF OUR STAFF ARE NOT CERTIFIED IN ALL AREAS" BUT THAT DOES NOT INCLUDE ME, A CAPTAIN, A CAPTAIN [illegible] #1 FOR DUTY, AND FOUR OTHER STAFF MEMBERS BUT THAT IS OFF THE RECORD.

Herbert Bryant:     Umm. I don't have a water rescue cert. count me in buddies!

Jeff Sypole:        Does anyone still have [M]at[t] [C]ox on their Facebook. [sic] I wanted to make a picture of something he posted…but he either deleted me as a friend or deleted his facebook. [sic]

Jeff Sypole:        Wow, tough crowd tonight[.]

Plaintiff Terrell:  I can't find it he must have deleted it[.]

Plaintiff Conner:   I don't have em [sic] as a face book [sic] friend. Sorry buddy. I'm gonna miss you tomorrow. You were a good kitchen [expletive]. Gonna have Dj [sic] bring me some eggs[.]

11

Jeff Sypole:          He posted bhi's open officer announcement
                      like a boss[.]

Plaintiff Conner:     Lol. That's awesome[.]

Herbert Bryant:       I heard on yik yak [sic] the other day
                      that Matt and Nickyt were lovers[.]

Jeff Sypole:          I heard [M]att was his role model[.]

Plaintiff Conner:     Lol. They made a combination Facebook
                      page together. There [sic] profile pic is
                      them all geared up kicking in the door at
                      the shoals club[.]

Herbert Bryant:       It's like in the movies.  You know when
                      at first the characters hAte [sic] each
                      other but then they become lovers. That
                      is how it is with Matt and Nicky[.]

Jeff Sypole:          [image containing exchange from social
                      media platform "Yik Yak"] Matt C is my
                      hero and the protector of us all. Because
                      that isn't illegal[.] What is there to do
                      downtown? your [sic] all [expletive][.]
                      WAKE THE [expletive] UP[.] If I stay over
                      and you don't wanna [expletive] in the
                      morning….Not okay[.] Glad I live in
                      Wilmington cuz [sic] you people slackin
                      [sic] on here[.] Hungover, sittin [sic]
                      at the hair salon munchin [sic] on
                      [illegible].

Herbert Bryant:       It's totally on now sissies[.]

Herbert Bryant:       [image of can labeled "C4 EXTREME"]

Herbert Bryant:       Hahaha Matt And Nicky = superheroes[.]

Plaintiff Conner:     All you need is a shot of [a]pple cider
                      vinegar to pump you up. None of that
                      [expletive].

Plaintiff Terrell:    You guys are all just jealous because
                      Matt is the best and coolest supervisor
                      on BHI [Bald Head Island] and he chose me
                      to be his BFF [Best Friend Forever][.]

12

Plaintiff Terrell:   C4 is the bomb[.]

Plaintiff Terrell:   How does apple cider vinegar get you pumped up?

Herbert Bryant:      Apple cider vinegar is code for meth.

Plaintiff Conner:    It's a vasodilator. And it's filled with [B] vitamins and a bunch of bad [expletives]. Gotta [sic] drink the organic kind with the mother. Pumps you up baby.

Plaintiff Terrell:   Oh ok code for meth, that makes more sense[.]

Plaintiff Conner:    It's pretty tuff [sic] to do a shot of it though. It's some strong stuff.

Jeff Sypole:         [image of an officer character containing the following words] WHO AM I? I'M THE DUDE, PLAYING A DUDE, DISGUISED AS ANOTHER DUDE.

Plaintiff Conner:    I got some in my cupboard at work. Give I [sic] a try.

                     Friday, August 15, 2014

Plaintiff Koons:     It's with the utmost pride and confidence we here on d shift had [sic] be [sic] told by are [sic] command staff that [R]obin [W]allace is promoted to interim leadership role (Lt. spot). [I]f u [sic] have any pressing shift matters and concerns u [sic] will now answer to her directly[.]

Jeff Sypole:         Haha

Plaintiff Koons:     U [sic] think Iam [sic] kidding[,] this [expletive] just happened[.]

Plaintiff Terrell:   Wow!! Whose decision was that[?]

13

Plaintiff Kooons:    Oh u [sic] know[,] the think tank, they
                     sat us down and dropped that [expletive]
                     on us[.]

Plaintiff Terrell:   Did she agree to be in charge[?]

Plaintiff Koons:     Oh ya [sic] she did it 4 [sic] the
                     shift[.]

Jeff Sypole:         What does Jesse think[?]

Plaintiff Conner:    I think it is an amazing decision. She
                     has 15 yrs [sic] experience and has had
                     leadership classes. She also was a
                     previous sergeant. It's the clear choice.

Jeff Sypole:         [Image containing words "Pre" and image
                     of a pear].

Plaintiff Terrell:   Ask her what your plan of attack is when
                     you get a fire or what you guys should do
                     when you get a bad medical. Oh yea [sic]
                     also what's her plan when you guys get
                     that water rescue call[.]

Plaintiff Terrell:   She didn't help your shift[,] she just
                     hurt it and she should have the integrity
                     to say so[.]

                     Additional conversation
                     on Friday, August 15, 2014

Plaintiff Koons:     This is gettin[g] out of control[,]
                     over[.]

Plaintiff Conner:    Her plan is to delegate everything. She
                     already told us that. Sounds like a good
                     plan.

Plaintiff Koons:     Ya [sic] we were told that Jesse is got
                     [sic] at med and fire so he should handle
                     those calls and Iam [sic] to take the
                     police calls[.]

Jeff Sypole:         Robin?

14

Notwithstanding the mention of the text messages at these termination meetings, plaintiffs were not provided a copy of the text messages upon which their terminations were based. Even so, plaintiffs did not deny participation in text message exchanges with other public safety officers, but rather denied these text messages violated Village policies as alleged.

Officer Herbert Bryant, who is not a party to this action, was also terminated due to his participation in the relevant text message exchange.[3] At least five other employees of Defendant Village participated in the relevant text message exchange but were not terminated, and two of the five were not disciplined at all.

As part of the termination process, Defendant Mitchell completed four separate forms, one for each employee, Form F-5B, known as a Report of Separation, listing the basis for plaintiffs' terminations. On these forms, bearing Defendant Mitchell's signature and a notary signature, Defendant Mitchell provided an additional reason for plaintiffs' terminations. She stated plaintiffs were terminated because "a complaint was filed with [the Public Safety Department] regarding [plaintiff] and several others involving inappropriate electronic communications that created a hostile work environment in violation of Village policy."

---

[3] This officer is the plaintiff in a pending related case before this court, Bryant v. Village of Bald Head Island, No. 7:14-CV-223-H (E.D.N.C.)

[D.E. #1-5 Affs. of Separation at 2, 4, 6, and 8]. These forms were provided to the North Carolina Department of Justice and law enforcement agencies for consideration in connection with future employment requests made by plaintiffs.

In the days following plaintiffs' terminations, Plaintiffs Terrell, Conner, and Koons each sought redress by sending letters to Defendant Village and requesting appeal of the termination or a grievance hearing. [D.E. #55 Pls.' Response to Motion for Summary Judgment at 3]. Plaintiff Cannon did not send a letter of appeal. [D.E. #55-1 Cannon Dep. at 25]. In response, Defendant Peck informed plaintiffs, in writing, that their employment was "at-will and as such [could] be terminated for any reason or for no reason. There is no right to a grievance or appeal process." [D.E. #57-5 Peck Responses to Appeal Letters].[4]

According to Defendant Mitchell, Officer Nick Hiatt was the complainant identified as reporting the hostile work environment. Defendant Mitchell learned of the relevant text message exchange by apparent happenstance when meeting with Officer Hiatt on an unrelated allegedly unprofessional employee conduct matter involving Officer Hiatt. According to Defendant Mitchell, at this meeting Officer Hiatt threw his cell phone on the table and told Defendant Mitchell, "You want to see unprofessional? I'll show you

---

[4] Plaintiff Conner was employed under a two year contract with Defendant Village and as such was not an "at-will" employee. [D.E. #1-6].

unprofessional." [D.E. #56-5 Mitchell Dep. at 134]. Defendant Mitchell testified Officer Hiatt was offended by the text message exchange and she believed another officer, Lieutenant Matthew Cox, was the subject of harassment therein. Defendant Mitchell further testified Lieutenant Cox reported he was "frustrated" and upset with the text message exchange, believing he was the subject of unseemly jokes.

According to the sworn testimony of Officer Hiatt, however, many of Defendant Mitchell's statements are either not true or a mischaracterization of his comments. For example, Officer Hiatt testified he was not offended, sexually harassed, upset, or subject to a hostile work environment, nor did he make a complaint alleging such. He also denies he stated the text messages were unprofessional or that Lieutenant Cox was harassed or offended. Instead, Officer Hiatt testified he published the text message exchange to Defendant Mitchell evidencing his concern for public safety within Defendant Village's jurisdiction because of poor community, communication, training, and understanding of duties among employees within the Public Safety Department. In the aftermath of plaintiffs' terminations, Officer Hiatt rebuffed Defendant Mitchell's characterization of him as the complainant when she advised he should guard his comments in light of his role in alerting her of facts used to support plaintiffs' terminations.

17

In further apparent contradiction of Defendant Mitchell's testimony, Lieutenant Cox denied ever reading the relevant text message exchange, much less making any complaint to Defendant Mitchell he was upset or offended. In his deposition, Lieutenant Cox denied being offended, harassed, sexually harassed, upset, or otherwise subject to a hostile work environment as a result of comments or actions by plaintiffs or another terminated officer.

According to Defendant Mitchell, she recommended termination of plaintiffs with the unanimous consent of her command staff. Captain Freeman, however, disputes this statement in his affidavit testifying he neither recommended the terminations nor observed violations of Defendant Village's policies. Captain Freeman even stated he was present at a meeting with Defendant Mitchell where the terminations of plaintiffs were discussed, and when asked whether he supported the decision to terminate them at that meeting he indicated he did not support the decision. [D.E. #58-2 Freeman Aff. at 2]. No notes have been produced from this meeting or any other relevant meetings Defendant Mitchell may have had with her command staff, and it appears no notes were taken to aid in the resolution of this factual question. Notes have been produced from Defendants Peck and Mitchell's meetings with plaintiffs. [D.E. #59-8 Termination Meeting Notes].

As part of the decision-making process, Defendant Mitchell admits she made no determination about whether the text messages

18

sent by plaintiffs or the other terminated officers constituted harassment, sexual harassment, discourteous treatment of other employees, or inappropriate electronic communications. Instead, in her deposition, Defendant Mitchell stated the question of plaintiffs' terminations was limited to whether she and the command staff wanted plaintiffs and the other terminated officer to be "part of [the] team." [D.E. #56-5 Mitchell Dep. at 177]. However, when asked about her characterization of the relevant text message exchange, Defendant Mitchell said, "It's a bunch of guys just talking [expletive], excuse the term, but they're just talking [expletive]." [Id. at 293].

After Defendant Mitchell's review of the relevant text message exchange and consultation with her command staff, she delivered her recommendations to Defendant Peck. As a result of his review, Defendant Peck reached the same conclusion as Defendant Mitchell, stating in his deposition, "Mr. Cannon and the rest were terminated because they were jerks. That they were disrespectful -- disrespectful of the chain of command, and once I determined that, I turned it over to HR to write the letter." [D.E. #56-4 Peck Dep. at 83]. While as at-will employees, Plaintiffs Terrell, Koons, and Cannon may have been terminated "because they were jerks" or "disrespectful of the chain of command[,]" the scope of allegations contained in plaintiffs' termination letters and Forms F-5B appears broader than the reasons

19

relied upon in the decision-making process as stated by Defendants Mitchell and Peck in their depositions.[5]

Notes from the termination meetings indicate Defendants Peck and Mitchell told plaintiffs, "[w]e will not initiate any statements to the media – so if it gets in the news, it won't be because we initiated." [D.E. #59-8 Termination Notes at 3; D.E. # 59-1 Ellison Williams Dep. at 74-75].[6] A few hours after terminating plaintiffs, Defendant Peck sent a mass email to all employees and public safety part-time staff of Defendant Village, which stated "[a]s many of you are aware, five officers have been released from employment this morning based on violations of Village policies pertaining to harassment, sexual harassment, discourteous conduct and inappropriate electronic communications." [D.E. #59-4 Peck Email]. The email continued to publish the allegedly defamatory statements contained in the termination letters as it accused plaintiffs and Officer Bryant of "[d]etrimental personal conduct [that] includes behavior of such a serious detrimental nature that the functioning of the Village may be or has been impaired; the safety of persons or property may be or ha[s] been threatened; or the laws of any government may be

---

[5] Plaintiff Conner was employed under a two year contract with Defendant Village and as such was not an "at-will" employee. [D.E. #1-6].

[6] These termination meeting notes were prepared by Karen Ellison, Defendant Peck, Defendant Mitchell, and Village's attorney in advance of the termination meetings with plaintiffs as a script for Defendants Peck and Mitchell to use. [D.E. #56-4 Peck Dep. at 118; D.E. #59-1 at 48].

20

or have been violated." Id. The email made no distinction among the five terminated officers and therefore all were said to have been terminated for the same reasons. On August 29, 2014, the day after plaintiffs' terminations, local media requested copies of the termination letters. Believing North Carolina's Public Records Act required compliance with the media requests, Director of Human Resources, Karen Ellison, turned over copies of the termination letters as requested. [D.E. #59-1 Ellison Williams Dep. at 75-76]. Plaintiffs filed suit on August 26, 2015.

## COURT'S DISCUSSION

### I. Plaintiff's Motion for Oral Argument in Opposition regarding D.E. #38 and #44 [D.E. #52]

After careful review and consideration of the motion of plaintiffs and determination the briefs submitted to the court by both parties are sufficient, plaintiffs' motion for oral argument in opposition regarding D.E. #38 and #44, [D.E. #52], is DENIED.

### II. Plaintiff's Motion for Extension of Time to Respond and Extend Length [D.E. #66]

After careful review and consideration of the motion of plaintiffs and determination the briefs submitted to the court by both parties are sufficient, plaintiffs' motion for extension of time to respond and length of response, [D.E. #66], is DENIED.

### III. Standard of Review

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists

21

and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e) (emphasis in original). A mere scintilla of evidence supporting the case is not enough. Anderson, 477 U.S. at 252. The court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in the non-movant's favor. Matsushita Elec. Indus. Co., 475 U.S. at 587-88.

## IV. Analysis

Defendant Mitchell's motion for summary judgment, [D.E. #38], and Defendants Peck and Village's motion for summary judgment, [D.E. #44], are before the court.

### A. Municipal Liability of Village under Monell for Plaintiff's Free Speech, Due Process, Liberty Interest, and Right to Privacy Claims under 42 U.S.C. § 1983

Defendant Village has moved for summary judgment on plaintiffs' claims under 42 U.S.C. § 1983 for violation of their rights to free speech, violation of their procedural due process

rights by deprivation of their liberty interests, and violation of their rights to privacy under the United States Constitution.

"[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution [or laws of the United States]." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 (1978). Absent "official . . . policy of some nature," a local governmental body is simply not liable under § 1983. Id. (noting that "official policy" may include governmental custom). When a plaintiff protests a single employment decision involving no violation pursuant to a municipal policy and the decision was made by an official without final policymaking authority, the municipality is not liable for § 1983 violations. Greensboro Prof'l Fire Fighters Ass'n, Local 3517 v. City of Greensboro, 64 F.3d 962, 963, 966 (4th Cir. 1995).

Plaintiffs argue, citing Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986), a municipality is liable even for a single decision when the decision is made by an official who has final decision making authority to establish municipal policy with respect to the action ordered. Pembaur, 475 U.S. at 481. However, Crowley v. Prince George's Cty, 890 F.2d 683, 684-87 (4th Cir. 1989), quotes Pembaur, and holds there is a distinction between the discretionary authority to make final decisions on a particular matter and the authority to make final policy on that matter.

23

Crowley, 890 F.2d at 686-87 (holding the fact that a police chief had "final" discretion to hire and fire employees of his police department did not establish that he was a "final policymaker" with regard to municipal employment policy); accord Greensboro Prof'l Fire Fighters Ass'n, 64 F.3d at 966. The Supreme Court has found "whether an official had final policymaking authority is a question of state law." Pembaur, 475 U.S. at 483.

North Carolina state law vests final policymaking authority in the elected city council. See N.C.G.S. § 160A-67 ("the government and general management of the city shall be vested in the council.") As to personnel matters, North Carolina law is quite specific about the roles of the elected city council and the city manager – North Carolina law provides while a city manager is the municipality's "chief administrator," he must comply with the general employment policies set by the council. See N.C.G.S. § 160A-148(1) (city manager must act "in accordance with such general personnel rules, regulations, policies, or ordinances as the council may adopt.") Because Defendant Peck, who made the final decision to fire plaintiffs was the city manager and not the city council, Defendant Peck did not have final policymaking authority, and thus there was no official policy or custom violation here.

Therefore, Defendant Village's motion for summary judgment on plaintiffs' 42 U.S.C. § 1983 claims for violation of their right to free speech, violation of their due process rights by

24

deprivation of their liberty interests, and violation of their right to privacy under the United States Constitution is GRANTED.

## B. North Carolina Constitutional Right to Privacy, Wrongful Discharge, Breach of Contract - Jesse Conner[7]

Because Defendant Village has not presented facts or case law to support a motion for summary judgment on the following claims: violation of constitutional right to privacy under the North Carolina Constitution; wrongful discharge; or Plaintiff Conner's claim for breach of contract, the court does not consider those claims, and they remain pending before this court.

## C. North Carolina Constitutional Right to Free Speech - Jesse Conner

Defendant Village moves for summary judgment on Plaintiff Conner's claim of violation of the right to free speech under the North Carolina Constitution.   Direct claims under the North Carolina Constitution "are permitted *only* in the absence of an adequate state remedy, and where an adequate state remedy exists, those direct constitutional claims must be dismissed." Wilcox v. City of Asheville, 730 S.E.2d 226, 236 (N.C. Ct. App. 2012) (emphasis in original and internal quotations omitted); see Corum v. Univ. of N.C., 330 N.C. 761, 782 (N.C. 1992). An adequate state remedy must give the claimant "at least the *opportunity* to enter the courthouse doors and present his claim and must provide the

---

[7] Plaintiffs' claim of breach of contract is only against Defendant Village as Defendants Peck and Mitchell are not employers of plaintiff.

25

*possibility* of relief under the circumstances." Wilcox, 730 S.E.2d at 237 (emphasis in original and internal quotations omitted). Thus, the chance as opposed to the guarantee of success is the measure. Id. at 299-300. The plaintiff bears the burden of establishing there is no "adequate" alternative state law remedy. See Patterson v. City of Gastonia, 725 S.E.2d 82, 90 (N.C. Ct. App. 2012). While a state remedy is inadequate when sovereign immunity would be a total bar to the claim, Craig ex rel. Craig v. New Hanover Cty. Bd. Of Edu., 363 N.C. 334 (N.C. 2009), cities, counties, and municipalities such as Defendant Village are immune from suit under the doctrine of governmental immunity, and waive that immunity when they enter into authorized contracts such as employment contracts with individuals to serve as police officers. Wray v. City of Goldsboro, 787 S.E.2d 433, 436 (N.C. Ct. App. 2016).

In Defendant Mitchell, Peck, and Village's Motion to Dismiss, [D.E. #20], this court found wrongful termination to be an available adequate state remedy precluding free speech claims under the North Carolina Constitution by plaintiffs who were at-will employees. Because Conner was allegedly not an at-will employee, the court found wrongful termination was not an adequate state remedy for Plaintiff Conner's free speech claim under the North Carolina Constitution. See D.E. #1-6 Conner Agreement. The court noted at that time, [D.E. #34], Plaintiff Conner's claim may

26

be precluded by the existence of other available adequate state remedies. The court now finds the existence of an available adequate state remedy, breach of contract, sufficient to address the injury Plaintiff Conner raises in a violation of the right to free speech under the North Carolina Constitution. See J.W. v. Johnston Cty. Bd. Of Edu., No. 5:11-CV-707-D, 2012 WL 4425439, at *17 (E.D.N.C. Sept. 24, 2012) (unpublished); see also Clagget v. Wake Forest, 486 S.E.2d 443, 448, (N.C. Ct. App. 1997) ("Breach of contract is the remedy for a wrongfully discharged employee who is employed for a definite term or who is subject to discharge only for just cause." (internal citations omitted)). Therefore, Defendant Village's motion for summary judgment as to Plaintiff Conner's claim for violation of the right to free speech under the North Carolina Constitution is GRANTED.

### D. **Libel**

#### a. **Actual Malice**

Defendants Village, Peck, and Mitchell have moved for summary judgment on plaintiffs' claim for libel under North Carolina law. To prove a claim of defamation, a plaintiff must show four elements: (1) defendants published false oral (slander) or written (libel) statements, (2) of or concerning the plaintiff, (3) which were published to a third person, (4) resulting in damage to the plaintiff's reputation. Tyson v. L'Eggs Products, Inc., 351 S.E.2d 834, 840 (N.C. Ct. App. 1987). When the plaintiffs are public

27

officials, as here, and the allegedly defamatory statements concern their official conduct, the plaintiff must also prove actual malice. Varner v. Bryan, 440 S.E.2d 295, 299 (N.C. Ct. App. 1994) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)); Dellinger v. Belk, 238 S.E.2d 788, 789 (N.C. Ct. App. 1977) (citing Cline v. Brown, 210 S.E.2d 446 (1974), cert. den., 211 S.E.2d 793 (N.C. 1975) (holding a law enforcement officer is a public official). To prove actual malice, the plaintiff must show by clear and convincing evidence, the defendant made the statement with knowledge of its falsity or with reckless disregard of whether the statement was false. Varner, 440 S.E.2d at 299 (quoting New York Times Co. v. Sullivan, 376 U.S. at 270). At the summary judgment stage, for the plaintiffs' claim to survive, the plaintiffs must show sufficient evidence to support a juror finding actual malice. Varner, 440 S.E.2d at 299 (quoting Anderson, 477 U.S. at 257.

Plaintiffs' defamation claims are based on allegedly false statements made in plaintiffs' termination letters and Forms F-5B as well as Defendant Peck's email to all Village employees just hours after termination of plaintiffs. [D.E. #1 Compl. at 13-15; D.E. #55 Plaintiff's Response at 9; D.E. #59-4 Peck Email]. Specifically, in each plaintiff's Form F-5B, Defendant Mitchell wrote "[a] complaint was filed with this agency regarding this Officer and several others involving inappropriate electronic

communications that created a hostile work environment in violation of Village policy." [D.E. #56-6 Form F-5B Cannon at 1-2; #56-7 Form F-5B Conner at 1-2; #56-8 Form F-5B Koons at 1-2; #56-9 Form F-5B Terrell at 1-2].

Plaintiffs cite depositions and affidavits which show the officer who was an alleged "complainant" and the lieutenant who felt harassed, actually never made complaints to Defendant Mitchell as to feeling offended or sexually harassed by plaintiffs or that they worked in a hostile work environment due to actions by plaintiffs. [D.E. #57-6 Aff. Of Nick Hiatt at 1,2; D.E. #57-7 Supp. Aff. Of Nick Hiatt at 1; D.E. #58-1 Cox Dep. at 30-34]. Defendant Peck admitted in his deposition he thought the officers on the text message thread who were terminated were "jerks" and that they were "disrespectful of the chain of command." [D.E. #56-4 Dep. Calvin Peck at 83]. Defendant Mitchell admitted that after a review of the text messages, she made the decision with Captain Freeman, Captain Swanson, and Captain Anderson that they did not want plaintiffs "as a part of [their] team" and that they found some of the messages offensive. [D.E. #56-5 Mitchell Dep. at 160, 177]. However, Captain Freeman stated in his affidavit he did not support the recommendation that plaintiff be terminated and was unaware of any person feeling harassed by any of the terminated officers. [D.E. #58-2 Aff. Freeman at 1, 2]. Therefore, the statement in Form F-5B "[a] complaint was filed" could be

29

considered by a reasonable juror to be a false statement, and testimony within depositions would give credibility to defendants' knowledge of falsity or reckless disregard of falsity with which that statement was made.

Statements which a reasonable juror could find defamatory were not limited to the statements in the Form F-5B. As to the statements made within Plaintiff Cannon and Terrell's termination letters that their participation in text messages constituted sexual harassment and created a hostile working environment; that Plaintiff Cannon, Terrell, and Koons' conduct constituted harassment; and that each of the plaintiffs' conduct constituted "detrimental personal conduct," these statements could be found false by a reasonable juror considering the definitions of sexual harassment, harassment, and detrimental personal conduct in Village's Policy Guidelines. [D.E. #57-4 Village Policy at 4, 12]. There is no evidence these messages exchanged on personal cellphones created a hostile work environment. The only officers identified by defendants as having their work affected by the messages were Officer Hiatt and Lieutenant Cox, and both have denied sexual harassment. [D.E. #57-6 Aff. Of Nick Hiatt at 2; D.E. #58-1 Cox Dep. at 30-33, 38-39]. Plaintiffs show the definition contained in Defendant Village's policy is the exact same definition of "sexual harassment" that is a violation of Section 703 of Title VII set forth by EEOC. 29 C.F.R. § 1604.11.

For Title VII cases, the Supreme Court has determined that "sexual harassment" causing a "hostile work environment" must be "sufficiently severe or pervasive to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)). In addition, the only conduct defendants identified that formed the basis of their claims of sexual harassment was a single series of text messages and not a pattern of conduct. [D.E. #56-5 Mitchell Dep. at 144-45; D.E. #56-4 Peck Dep. at 60; D.E. #1-1 at 1; #1-2 at 1; #1-3 at 1; #1-4 at 1].

Additionally, plaintiffs have presented evidence from the deposition of Dr. Karen Ellison Williams, the Director of Human Resources and Communications for the Village, at the time of the incidents in question, that Defendants Peck and Mitchell were both involved in selecting the language of the termination letters. [D.E. #59-1 Ellison Williams Dep. at 36]. Dr. Williams testified Defendants Peck and Mitchell made the distinctions between the reasons the five different officers were terminated. Id. at 36-37. Dr. Williams testified additionally that Defendants Peck and Mitchel asked for sections of the Village Policy that would allow for immediate termination. Id. Defendant Peck was unable to show any text message that met the definition of harassment as defined

by Village policy and referenced in Plaintiff Cannon, Terrell, and Koons' termination letters. [D.E. #56-4 Peck Dep. at 82, 85-88].

After terminating plaintiffs earlier that morning, Defendant Peck sent an email to all employees of Village, including public safety part-time staff, at 10:40 am on August 28 2014. [D.E. #59-4]. Defendant Peck did not specify which plaintiffs had been terminated for which reasons, but instead he listed the names of all four plaintiffs, as well as Officer Bryant, and stated they had been terminated "based on violations of Village policies pertaining to harassment, sexual harassment, discourteous conduct and inappropriate electronic communications." [D.E. #59-4 at 2]. A reasonable juror could find the statements in the email falsely implied that each plaintiff had been terminated due to sexual harassment and harassment, showing defendants' knowledge of falsity or reckless disregard of falsity with which the statement in the email was made. Thus, plaintiffs have shown evidence exists of actual malice.

### b. **Privilege**

Additionally, defendants argue they are entitled to absolute or qualified privilege. A statement which is absolutely privileged will not support a defamation claim even if the statement was knowingly false and made with express malice. Smith v. McDonald, 895 F.2d 147, 148-49 (4th Cir. 1990). However, absolute privilege only applies where the communication is made in the course of a

judicial proceeding. Id. at 149. "Judicial proceeding" has been defined broadly, Id., including "communications made in the course of an administrative proceeding . . . [where] the administrative officer or agency is exercising a judicial or quasi-judicial function." Id. (quoting Mazzucco v. North Carolina Bd. of Med. Exam'rs., 228 S.E.2d 529, 532 (N.C. Ct. App. 1976)). Therefore, a quasi-judicial function includes administrative investigation into the performance of an employee to determine whether to terminate as well as investigation to substantiate the evidentiary file in support of a decision to terminate. Angel v. Ward, 258 S.E.2d 788, 792 (N.C. Ct. App. 1979). In the instant case, there was no exercise of quasi-judicial function because the termination already occurred as the allegedly defamatory statements were made in the termination letters, email, and the Forms F-5B.

Qualified privilege applies where defendants can establish (1) good faith on the part of the defendant; (2) the statement is made on the subject matter in which the declarant has an interest, right or duty; (3) the statement is communicated to a person with a corresponding interest or duty; (4) on a privileged occasion; and (5) the statement is made in a manner warranted by the duty, right, or interest at issue. Averitt v. Rozier, 458 S.E.2d 26, 29 (N.C. Ct. App. 1995) (quoting Shillington v. K-Mart Corp., 402 S.E.2d 155, 159 (N.C. Ct. App. 1991)). Once established that an occasion is privileged, there is a presumption of good faith; Id.

at 29, however, this presumption of good faith can be rebutted by plaintiff's showing of actual malice. Harris v. Proctor & Gamble Mfg. Co., 401 S.E.2d 849, 851 (N.C. Ct. App. 1991). Even if statements made in the Forms F-5B and publication to Training Standards Commission were protected under the qualified privilege because Defendant Mitchell had a duty to report to the Training Standards Commission, plaintiffs have brought forth evidence from which a reasonable juror could find actual malice sufficient to rebut qualified privilege. Defendants' argument regarding absolute or qualified privilege fails.

### c. Opinion

Finally, defendants in the instant case argue the allegedly defamatory statements constituted solely opinion. "Because defamation requires a false statement at its core, opinions typically do not give rise to liability since they are not susceptible of being proved true or false." Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015) (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 19-20 (1990)). "When a speaker plainly expresses 'a subjective view, an interpretation, a theory, conjecture or surmise, rather than [a] claim[ ] to be in possession of objectively verifiable [false] facts, the statement is not actionable.'" Biospherics, Inc. v. Forbes, Inc., 151 F.3d 180, 186 (4th Cir. 1998) (quoting Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993)). However, "[t]hough opinion per

34

se is not immune from a suit for libel, a statement is not actionable unless it asserts a provably false fact or factual connotation." Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1093 (4th Cir. 1993) (citing Milkovich, 497 U.S. at 19). Therefore, a statement that asserts provably false fact or factual connotation is actionable under defamation. Plaintiffs have shown evidence that the statements in the termination letters, email and Forms F-5B were provably false fact or factual connotation and not opinion. Defendants' argument fails.

Therefore, both Defendant Village's and Defendants Peck and Mitchell's motions for summary judgment as to the claim of libel are DENIED.

### E. **Free Speech**

Defendants Peck and Mitchell have moved for summary judgment on plaintiffs' claims under 42 U.S.C. § 1983 for retaliatory discharge in violation of their rights to free speech under the United States Constitution.

### a. **Introduction**

In Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968) and Connick v. Myers, 461 U.S. 138, 142 (1983), the Supreme Court analyzed the competing interests at play between the public employee "as a citizen, in commenting upon matters of public concern" and the government, "as an employer, in promoting the efficiency of the public services it performs through its

35

employees." Connick, 461 U.S. at 142 (quoting Pickering, 391 U.S. at 568). In McVey v. Stacy, 157 F.3d 271 (4th Cir. 1998), the Fourth Circuit laid out the test for balancing the Pickering and Connick competing interests in the context of a retaliatory discharge claim. The McVey test requires this court to determine:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's termination decision.

McVey, 157 F.3d at 277-78 (citing Stroman v. Colleton Cty. Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992)). Inquiries under this test are very specific as the Supreme Court has found "'[b]ecause of the enormous variety of fact situations in which critical statements by . . . public employees may be thought by their superiors . . . to furnish grounds for dismissal, we do not deem it either appropriate or feasible to lay down a general standard against which all such statements may be judged.'" Connick, 461 U.S. at 154 (quoting Pickering, 391 U.S. at 391). The first two elements of the test are questions of law, and the third is a question of fact. Crouse v. Town of Moncks Corner, 848 F.3d 576, 583 (4th Cir. 2017) (citing Brooks v. Arthur, 685 F.3d 367, 371 (4th Cir. 2012)).

36

### b. **Speech by Private Citizen on Public Concern**

Under Crouse, the first element of the McVey test is a two-part inquiry based upon whether the employee spoke as a private citizen or as a public employee pursuant to the employee's duties, Id. (citing Garcetti v. Ceballos, 547 U.S. 410, 421), and "whether the content of the speech addressed 'a matter of interest to the community' rather than 'complaints over internal office affairs.'" Id. (citing Connick, 461 U.S. at 149). To determine whether the person spoke as a citizen or as an employee, the court should consider "whether speech was made in the course of an employee's job" by "inquir[ing] into the employee's 'daily professional activities.'" Id. at 584 (quoting Hunter v. Town of Mocksville, 789 F.3d 389, 397 (4th Cir. 2015)). "The First Amendment does not protect speech made pursuant to a government employee's official duties, even when that speech is upon a matter of public concern." Id. (citing Garcetti, 547 U.S. at 421). However, the Supreme Court has also observed "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employee's speech." Rankin v. McPherson, 483 U.S. 378, 384 (1987).

Once the determination is made regarding whether an individual spoke as an employee or as a citizen, the court should determine whether the speech was of public concern by examining

37

the "content, form, and context of a given statement, as revealed by the whole record." Campbell v. Galloway, 483 F.3d 258, 267 (4th Cir. 2007) (citing Connick, 461 U.S. at 147-48). However, the Fourth Circuit in Crouse observes "[t]o be sure, '[p]ublic employees do not forfeit the protection of the Constitution's Free Speech Clause merely because they decide to express their views privately rather than publicly.'" Crouse, 848 F.3d at 586 (quoting Cromer v. Brown, 88 F.3d 1315, 1326 (4th Cir. 1996)).

"[The Fourth Circuit] ha[s] explained that the answer to the public concern inquiry rests on 'whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee.'" Edwards v. City of Goldsboro, 178 F.3d 231, 247 (4th Cir. 1999)) (citing Berger v. Battaglia, 779 F.2d 992, 999 (4th Cir. 1985)). "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." Kirby v. City of Elizabeth City, 388 F.3d 440, 446 (4th Cir. 2004) (citing Connick, 461 U.S. at 146). "Matters relating to public safety are quintessential matters of 'public concern.'" Goldstein v. Chestnut Ridge Volunteer Fire. Co., 218 F.3d 337, 353 (4th Cir. 2000) (citing Edwards, 178 F.3d at 247). In Goldstein, the Fourth Circuit found that speech of a firefighter consisted of matters of public concern when speech "included allegations that some

emergency personnel lacked required training and certifications; that the leadership of the company was overlooking violations of safety regulations; and that the conduct of crew members was jeopardizing the safety of the crew and of the public." Id. at 355.

Speech involves a matter of personal interest when it concerns "personal grievances, complaints about conditions of employment." Campbell, 483 F.3d at 267 (4th Cir. 2007). When speech is mixed such that it contains both matters of public concern and matters of personal interest, the court should consider the speech as a "single expression of speech to be considered in its entirety." Stroman, 981 F.2d at 157.

In the instant case all four plaintiffs' speech occurred during the period of July 25, 2014 to August 15, 2014 in the form of a series of text messages. As to context, the text messages were sent from all four plaintiffs' personal cellphones to fellow officers while Plaintiff Terrell and Plaintiff Koons were off-duty when they sent their text messages. [D.E. #55-8 at 1; D.E. #55-6 at 2; D.E. #55-7 at 1; D.E. #55-5 at 1]. The text messages were not published by plaintiffs to the public via news media or through personal social media. Plaintiffs were not acting in the course of ordinary employment or pursuant to their official duties when they were communicating with co-workers via text messages. Plaintiffs have introduced sufficient evidence for a reasonable

juror to conclude that plaintiffs were speaking as private citizens, not as government employees.

The amount, specific date of occurrence, and content of the text messages varied. Plaintiff Terrell sent twenty-three text messages on four days during the relevant period: Wednesday, August 6, 2014; Thursday, August 7, 2014; Sunday, August 10, 2014; and Friday, August 15, 2014. Plaintiff Conner sent twenty-five text messages on five days during the relevant period: Friday, July 25, 2014; Wednesday, August 6, 2014; Thursday, August 7, 2014; Sunday, August 10, 2014; and Friday, August 15, 2014. Plaintiff Koons sent sixteen text messages on four days during the relevant period: Wednesday, August 6, 2014; Thursday, August 7, 2014; Friday, August 8, 2014; and Friday, August 15, 2014. Two of Plaintiff Terrell and Plaintiff Conner's messages and three of Plaintiff Koons' were related to their concerns with an article posted in which they doubted the sufficiency of training of officers within the department of public safety. [D.E. #58-3 at 5, 6-7, 9]. In particular, the text message thread refers to a news article regarding the department with its implied source of information being Defendant Mitchell, that the department had all but two of the twenty on staff certified in law enforcement, firefighting, emergency medical, and water rescue. [D.E. #58-4].

Plaintiff Cannon was the only plaintiff whose text messages consisted solely of a matter of private interest, as Plaintiff

Cannon sent only two messages on Friday, July 25, 2014, neither of which were related to a matter of public concern. [D.E. #58-3 at 1]. Therefore, Plaintiff Cannon's speech is not protected as it is not upon a matter of public concern.

The text messages of Plaintiffs Terrell, Conner, and Koons show an incredulity regarding statements made in an article attributed to Defendant Mitchell, knowing them to be totally false. [D.E. #58-3 at 4-12]. Defendant Mitchell has admitted that none of the officers at the time were "certified" in water rescue. [D.E. #56-5 at 87-88]. The discussion regarding the truthfulness of the article, in which allegedly untrue statements about certification of officers were attributed to Defendant Mitchell, was an expression of "'concern about the inability of the [Department] to carry out its vital public mission effectively.'" Liverman v. City of Petersburg, 844 F.3d 400, 410 (citing Cromer, 88 F.3d at 1325-26). As in Goldstèin, where the speech "included allegations that some emergency personnel lacked required training and certifications; that the leadership of the company was overlooking violations of safety regulations; and that the conduct of crew members was jeopardizing the safety of the crew and of the public," the speech in the instant case raised concerns about officer certification and whether Defendant Mitchell was speaking truthfully regarding certification of officers. Goldstein, 231 F.3d at 355. Thus, plaintiffs were speaking as citizens on a matter

41

of public concern, as the news article was already accessible to the public via a common news source and the assertion that officers were certified who were allegedly not certified came to bear on the truthfulness, credibility, and strength of the Department to "carry out its vital public mission effectively." Liverman, 844 F.3d at 410.

The court may not divide the text message into parts of public concern and of personal grievance, but must consider the messages as a "single expression of speech to be considered in its entirety." Stroman, 981 F.2d at 157. While there were messages sent by Plaintiffs Terrell, Conner, and Koons that were actually off-duty commentary on matters of personal interest and not "a matter of interest to the community," Connick, 461 U.S. at 149, the "thrust" of the speech as a single expression was a matter of public concern. Cf. Liverman, 844 F.3d at 409.

### c. **Pickering-Connick Balancing Test**

Following a finding of speech by a citizen on a matter of public concern, "Pickering requires courts to balance 'the public employee's interest in speaking on matters of public concern against the government's interest in providing effective and efficient government through its employees.'" Crouse, 848 F.3d at 585 (quoting McVey, 157 F.3d at 278). "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." Connick, 461

U.S. at 145 (internal citations omitted). Specifically, the Fourth Circuit in Crouse observes "[f]or this inquiry, courts 'must take into account the context of the employee's speech . . . and the extent to which it disrupts the operation and mission of the agency.'" Crouse, 848 F.3d at 585 (quoting McVey, 157 F.3d at 278). "'The public's interest in hearing the employee's speech also weighs in the balance.'" Crouse, 848 F.3d at 585 (quoting Brickey v. Hall, 828 F.3d 298, 304 (4th Cir. 2016)). "Police are at the restricted end of the spectrum because they are 'paramilitary' – discipline is demanded, and freedom must be correspondingly denied." Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992) (citing Jurgensen v. Fairfax Cty, 745 F.2d 868, 880 (4th Cir. 1984)).

The police force has a significant need for discipline and adherence to the chain of command as a paramilitary organization, but defendants have not shown the speech disrupted the working environment, or that defendants reasonably anticipated disruption of the work environment so as to "impai[r] discipline by superiors; impai[r] harmony among co-workers; ha[ve] a detrimental impact on close working relationships; imped[e] the performance of the public employee's duties; interfer[e] with the operation of the agency; undermin[e] the mission of the agency; conflic[t] with the responsibilities of the employee within the agency; or mak[e] use of the authority and public accountability the employee's role

43

entails." McVey, 157 F.3d at 278 (citing factors to be considered in the balancing test) (citing Rankin, 483 U.S. at 388-89) (internal quotation marks omitted)). The record contradicts Defendant Mitchell's assertion that a complaint was filed or that any officers were harassed, sexually harassed, or otherwise felt the text messages damaged working relationships. Defendant Mitchell could not have reasonably anticipated that a complainant's work was disrupted when there was no complainant. In fact, the alleged "claimant" said he was not even offended by the text messages. Additionally, the speech was made privately to co-workers, which lessens the interest of the agency in efficiency as there is less threat to the agency of losing public respect, causing "departmental disruption." Cf. Grutzmacher v. Howard Cty, No. 15-2066, 2017 WL 1049473, at *8 (unpublished) (finding greater efficiency interest for government agency when speech made public as greater risk of "departmental disruption"). Therefore, the interest of employees speaking as private citizens on a matter of public concern outweighs the interest of the government because the speech raises "[s]erious concerns regarding officer training and supervision," which overcame the showing of the defendants as to government's interest in preventing workplace disruption. Liverman, 844 F.3d at 411.

#### d. Causal Relationship Between Speech and Termination

As to the third element of the McVey test, Plaintiffs Terrell, Conner, and Koons have presented sufficient evidence for a reasonable juror to find plaintiffs were fired for their speech. [D.E. #1-4 Terrell Termination Letter; #1-2 Conner Termination Letter; #1-3 Koons Termination Letter]. The causal relationship between plaintiffs' speech and their termination is undisputed.

#### e. Qualified Immunity as to Defendants Peck and Mitchell

Defendants Peck and Mitchell assert they are entitled to qualified immunity in their individual capacities on plaintiffs' claim under 42 U.S.C. § 1983 for retaliatory discharge in violation of their right to free speech under the United States Constitution.

"'[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Crouse, 848 F.3d at 583 (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982))). "To defeat a qualified immunity defense, a plaintiff must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (internal citations omitted)). "In order to hold that a right is clearly established, a court does not need to find

45

'a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" Id. (quoting Ashcroft, 563 U.S. at 741.) "The qualified immunity inquiry depends on the official's 'perceptions at the time of the incident in question.'" Id. (quoting Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994) (internal citations omitted)).

Case law from the late 1980s and forward establishes an officer may not terminate an employee in violation of his First Amendment right to free speech. Rankin, 483 U.S. at 383 ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech."); See also Cromer, 88 F.3d at 1325.

To determine whether a right is clearly established, "the relevant inquiry requires a particularized balancing that is subtle, difficult to apply and not yet well-defined.'" Id. at 1326 (quoting DiMeglio v. Haines, 45 F.3d 790, 806) (4th Cir. 1995) (internal citations omitted)). Applying this test to the facts and circumstances of this case, a reasonable official in the position of Defendants Peck and Mitchell would have known the plaintiffs' First Amendment rights to voice their concerns about public safety, a matter of public concern, were clearly established, because interests of the government of "discipline, morale, and good working relationships," were outweighed by the employee's interest in communicating about a matter of public concern. Id. at 1326-

27, 1329-31 (addressing racial discrimination as a matter of public concern).

Similarly, the Fourth Circuit in Ridpath v. Bd. of Governors Marshall Univ, 447 F.3d 292 (4th Cir. 2006), observed "[a]nd because of the 'sophisticated balancing' involved in First Amendment questions, 'only infrequently will it be clearly established that a public employee's speech on a matter of public concern is constitutionally protected.'" Ridpath, 447 F.3d at 320 (quoting McVey, 157 F.3d at 277). The Fourth Circuit found in Ridpath the defendants were not entitled to qualified immunity, noting "[s]till, public employers enjoy only qualified – not absolute – immunity, and a public employer can find no refuge in qualified immunity when an adverse employment decision clearly contravenes a public employee's First Amendment rights." Id. at 320-21.

In the instant case, a reasonable officer in the position of Defendants Peck and Mitchell would have known of the clearly established right to free speech and that Plaintiff Terrell, Conner, and Koons' termination violated that right. Because there was no violation of the constitutional rights of Plaintiff Cannon as his speech was unprotected, Defendants Peck and Mitchell are entitled to qualified immunity as to the free speech claim of Plaintiff Cannon.

47

Therefore, Defendants Peck and Mitchell's motion for summary judgment as to Plaintiff Cannon's claim of 42 U.S.C. § 1983 retaliatory discharge in violation of his right to free speech under the United States Constitution is GRANTED. Defendants Peck and Mitchell's motion for summary judgment as to Plaintiff Terrell, Conner, and Koons' claim of 42 U.S.C. § 1983 retaliatory discharge in violation of their right to free speech under the United States Constitution is DENIED.

## F. **Violation of Procedural Due Process by Deprivation of Liberty Interest**

Defendants Peck and Mitchell have moved for summary judgment on plaintiffs' claim under 42 U.S.C. § 1983 for deprivation of their liberty interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

"[A] Fourteenth Amendment 'liberty interest is implicated by public announcement of reasons for an employee's discharge.'" Sciolino v. City of Newport News, Va., 480 F.3d 642, 645-46 (4th Cir. 2007) (quoting Johnson v. Morris, 903 F.2d 996, 999 (4th Cir. 1990)). A § 1983 claim arising from such a public announcement concerns the Fourteenth Amendment: (1) liberty to engage in any of the common occupations of life and (2) right to due process where a person's good name, reputation, honor, or integrity is at stake because of government action. Sciolino, 480 F.3d at 646 (internal citations omitted).

For a claim under the Due Process Clause for violation of this liberty interest, a plaintiff must show the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false. Id. (citing Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 n.5 (4th Cir. 1988)). "[T]he constitutional harm, however, 'is not the defamation' itself; rather it is the 'denial of a hearing at which the dismissed employee has an opportunity to refute the public charge.'" Id. at 649 (quoting Cox v. N. Va. Transp. Comm'n, 551 F.2d 555, 558 (4th Cir. 1976). "Indeed, decades earlier, in its decision in Bd. of Regents v. Roth, the Supreme Court recognized that 'notice and an opportunity to be heard are essential' when a public employee's liberty interest is infringed by a charge implying such serious character defects as 'dishonesty[ ] or immorality' lodged in the course of an injury such as failure to rehire." Ridpath, 447 F.3d at 313-14 (quoting Bd. of Regents v. Roth, 408 U.S. 564, 573 (1972) (internal quotation marks omitted)). Finally, the Fourth Circuit reiterated the finding of the Supreme Court, "[f]undamental to due process is an opportunity to be heard – 'an opportunity which must be granted at a meaningful time.'" Sciolino, 480 F.3d at 653 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

In the instant case, Defendants Peck and Mitchell move for summary judgment on plaintiffs' procedural due process claim for

49

deprivation of liberty interest for the following reasons:
Defendant Mitchell was not responsible for making any decisions
about what sort of appeal or grievance process would be provided
to plaintiffs; plaintiffs did not clearly request a "name clearing
hearing"; plaintiffs did not contest the accuracy of the underlying
allegations; defendants did not voluntarily disclose plaintiffs'
termination letters; plaintiffs had alternative state law
processes to contest the accuracy of the termination letters;
plaintiffs have not been foreclosed from future public employment;
and Defendant Peck is entitled to qualified immunity. [D.E. #47
at 1; D.E. #48 at 2].

### a. Charges Placed a Stigma on Plaintiff's Reputation

First, "[t]he type of communication that gives rise to a
protected liberty interest implies 'the existence of serious
character defects such as dishonesty or immorality.'" Ridpath,
447 F.3d at 308 (quoting Robertson v. Rogers, 679 F.2d 1090, 1092
(4th Cir. 1982) (internal citations omitted)). Whether
communication is stigmatizing depends upon whether the
communication "imposed on [the plaintiff] a stigma or other
disability that foreclosed his freedom to take advantage of other
employment opportunities." Roth, 408 U.S. at 573. The record
reflects the statements placed in the termination letters by
Defendants Peck and Mitchell concluded that plaintiffs'

50

communications were in violation of a varying combination of Village policies. See supra, Statement of the Facts at 4.

Allegations of "harassment," "sexual harassment," and "detrimental personal conduct" fall within the conduct that could be classified as "serious character defects" and "immorality" as provided by the Fourth Circuit in Ridpath. Ridpath, 447 F.3d at 308 (quoting Robertson v. Rogers, 679 F.2d 1090, 1092 (4th Cir. 1982) (internal citations omitted)).

Defendants Peck and Mitchell assert plaintiffs were not foreclosed from employment opportunities as Plaintiffs Terrell, Conner, and Koons are currently employed. [D.E. #48 at 21]. However, there is sufficient evidence showing these allegations "foreclosed [their] freedom to take advantage of other employment opportunities." Roth, 408 U.S. at 573. For example, Plaintiff Terrell was only able to secure a part-time position at Oak Island Fire and Rescue and later a full-time position at less than his compensation with Village. [D.E. #58-8 Terrell Interrogatories at 2-3]. Plaintiff Conner was able to secure employment with Oak Island Fire Department at a lower rate of pay, and without any law enforcement duties, after an extensive interview process, and relying on the personal knowledge and recommendations of persons in that department. [D.E. #58-6 Conner Interrogatories at 2-3]. Plaintiff Koons was unemployed for approximately one year after his termination at Village during which time he applied

unsuccessfully with four police departments and one sheriff's office, and finally on his second application obtained employment with the Town of Shallotte Police Department. [D.E. #58-7 Koons Interrogatories at 2-3]. Plaintiff Cannon was unable to secure employment after he applied unsuccessfully with ten separate entities including four police departments and two sheriff's offices. [D.E. #58-5 Cannon Interrogatories at 2-3].

The record contains sufficient evidence of stigma.

## b. Charges Were Made Public by the Employer

As to the second element, plaintiff must show "a likelihood that prospective employers (i.e., employers to whom he will apply) or the public at large will inspect the file." Sciolino, 480 F.3d at 650. In the instant case, it is undisputed the charges in the termination letters and Forms F-5B were produced to news media and the Criminal Justice Education and Training Standards Commission, respectively. Obviously, disclosure to the media informs the public at large and it is likely prospective employers would inspect the Forms F-5B in the course of determining plaintiffs' fitness for employment. See Scott v. Town of Taylortown, 2014 WL 4114313 *6 (M.D.N.C. 2014) (unpublished). Additionally, Defendant Peck sent an email to all Village employees and part-time staff of the department of public safety informing them that the five officers were terminated for violating Village policies related to harassment, sexual harassment, discourteous treatment of other

employees, and inappropriate electronic communications without making any distinctions as to which officers were terminated for violating particular policies. [D.E. #59-4 Peck Email to Employees].

Defendants Peck and Mitchell assert that disclosure was not made voluntarily as Defendant Peck and Human Resources felt respectively obligated to give the termination letter in response to media requests pursuant to the North Carolina Public Records Act and N.C.G.S. 160A-168(b)(11). However, this argument is misplaced as there is no requirement that the "making public" be "voluntary." Additionally, Defendant Peck's email to all Village employees and part-time staff of the department of public safety was voluntarily sent without any request for the information. Therefore, the court finds sufficient evidence of element two to survive summary judgment.

## c. Charges Were Made in Conjunction with Plaintiff's Termination

Next, plaintiff must show "a public employer's stigmatizing remarks [were] 'made in the course of a discharge or significant demotion.'" Ridpath, 447 F.3d at 309 (quoting Stone, 855 F.2d at 172 n. 5). The charges in the instant case were stated explicitly in the termination letters. [D.E. #1-1; #1-2; #1-3; #1-4]. On September 8, 2014, Defendant Mitchell prepared the Forms F-5B, Affidavit of Separation, stating as the reason for separation and

investigation that a "complaint was filed," regarding "inappropriate electronic communications that created a hostile work environment in violation of Village policy." [D.E. #56-6; #56-7; #56-8; #56-9]. Therefore, plaintiffs have shown the stigmatizing remarks were made in the course of plaintiffs' discharge.

## d. **Charges Were False**

"There can be no deprivation of liberty unless the stigmatizing charges at issue are false." Ridpath, 447 F.3d at 312 (citing Stone, 855 F.2d at 172 n. 5). Defendant Peck argues the charges were not false, as plaintiffs did not dispute sending the text messages. [D.E. #48 at 19-20]. Defendant Peck cites Codd v. Velger, 429 U.S. 624, 627-28 (1977), arguing plaintiffs, like plaintiff in Codd, only dispute the characterization of their conduct, not the conduct itself. Codd, 429 U.S. at 628. However, here the falsity alleged is not the falsity of the characterization of the conduct or speech of plaintiffs, but rather the falsity of the reasons for terminating plaintiffs as listed in the termination letters, email, and Forms F-5B. [Compl. ¶¶ 54, 72, 77]. In Codd, the liberty interest claim failed because the plaintiff did not dispute the "substantial accuracy of the report." Codd, 429 U.S. at 628. However, in the instant case, plaintiffs contest the substantial accuracy of each allegation in their termination letters, in the email, and Forms F-5B on the grounds the

54

allegations are inconsistent with Village policy definitions and testimony of alleged "complainant." [D.E. #55 at 24-25; #55-4 Terrell Dep. at 34-35; #55-2 Conner Dep. at 15-16; #55-3 Koons Dep. at 55; #55-1 Cannon Dep. at 30-31].

As discussed supra, there is a factual dispute as to whether any "complaint" was ever filed and the reasons given for termination by Defendant Peck in his deposition are different from the reasons in the termination letters, email, and Forms F-5B. Plaintiffs have shown sufficient evidence for a reasonable juror to find the allegations against plaintiffs were false.

**e. Qualified Immunity**

Defendant Peck asserts he is entitled to qualified immunity in his individual capacity on plaintiffs' claim under 42 U.S.C. § 1983 for deprivation of liberty interest in violation of the Due Process Clause of the United States Constitution.

"'[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Crouse, 848 F.3d at 583 (quoting Pearson, 555 U.S. at 231 (quoting Harlow, 457 U.S. at 818)). "To defeat a qualified immunity defense, a plaintiff must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" Id. (quoting Ashcroft, 563 U.S.

55

at 735 (internal citations omitted)). "In order to hold that a right is clearly established, a court does not need to find 'a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" Id. (quoting Ashcroft, 563 U.S. at 741.) "The qualified immunity inquiry depends on the official's 'perceptions at the time of the incident in question.'" Id. (quoting Rowland, 41 F.3d at 173 (internal citations omitted)).

The second element of the qualified immunity question is not precluded by the lack of case law that speaks to the very act of defendants being in violation of a plaintiff's rights. Ridpath, 447 F.3d at 313. "Thus, 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" Id. (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002). "The 'salient question' is whether the state of the law at the time of the events in question gave the officials 'fair warning' that their conduct was unconstitutional." Id.

In the instant case, a reasonable official in the position of Defendant Peck should have known that due process rights were clearly established, as the Supreme Court "recognized that 'notice and an opportunity to be heard are essential' when a public employee's liberty interest is infringed by a charge implying such serious character defects as 'dishonesty[] or immorality' lodged in the course of an injury such as [adverse employment action]."

Id. at 313-14 (quoting Roth, 408 U.S. at 573. Considering that the violated right was clearly established and a reasonable official would have known of this right, Defendant Peck is not entitled to qualified immunity as to plaintiffs' claims for deprivation of liberty interest in violation of the Due Process Clause of the United States Constitution.

### f. Name-Clearing Hearing and Defendant Mitchells' Involvement

While defendants argue plaintiffs' initial request for a name-clearing hearing was not clear, [D.E. #48 at 22-23], the clarity of a request for a name-clearing hearing is not required. "An employer need only grant a name-clearing hearing if it will make false damaging charges about a former employee available to those likely to request the information, e.g., future employers to whom the employee will apply." Sciolino, 480 F.3d at 650. Therefore, a name-clearing hearing was already required under Sciolino, and the clarity of the request after dissemination of false, stigmatizing charges is not dispositive. Additionally, the defendants' offer for a post-termination hearing on or about September 30, 2016, [D.E. #69 Defendant's Suggestion of Mootness (Partial) at 1], was insufficient for a name-clearing hearing under Sciolino. "An opportunity to clear your name after it has been ruined by dissemination of false, stigmatizing charges is not 'meaningful.'" Sciolino, 480 F.3d at 653.

57

Additionally, Defendant Mitchell asserts she was not responsible for making any decisions about what sort of appeal or grievance process would be provided to plaintiffs, and as a result, plaintiffs' due process claim for deprivation of liberty interest should be dismissed against her. However, plaintiffs have provided evidence of involvement as Defendant Mitchell drafted each Form F-5B; chose language for each termination letter in collaboration with Defendant Peck; assisted in compiling termination meeting notes prohibiting a review if requested [D.E. #59-8 Termination Meeting Notes; D.E. #59-1 Ellison Williams Dep. at 49]; and recommended termination to Defendant Peck on the basis that a "complaint" had been filed. Defendant Mitchell's assertion that plaintiffs have not shown personal involvement is without basis in the facts of this case.

Defendants Peck and Mitchell also argue plaintiffs' claim for violation of due process by deprivation of liberty interest should be dismissed because there are available adequate state remedies. While available adequate state remedies preclude claims under the North Carolina Constitution, Corum, 413 S.E.2d at 289, defendants have not cited sufficient case law to support that all United States Constitutional claims are precluded.

Therefore, Defendants Peck and Mitchell's motions for summary judgment as to plaintiffs' claim of 42 U.S.C. § 1983 deprivation

of liberty interest in violation of Due Process Clause of the
United States Constitution is DENIED.

## CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Oral
Argument in Opposition to D.E. #38 and #44, [D.E. #52], and
plaintiffs' Motion for Extension of Time to Respond and Extend
Length, [D.E. #66], are DENIED. Defendant Mitchell's Motion for
Summary Judgment, [D.E. #38], is GRANTED in part and DENIED in
part. Defendants Peck and Village's Motion for Summary Judgment,
[D.E. #44], is GRANTED in part and DENIED in part.

Remaining before the court are the following claims:

1. Claims One and Four[8] – 42 U.S.C. § 1983 Violation of
   Constitutionally Guaranteed Liberty Interest in
   Violation of Procedural Due Process Clause as against
   Defendants Peck and Mitchell, in their individual
   capacities;

2. Claim Two – Plaintiff Terrell, Conner, and Koons' 42
   U.S.C. § 1983 Claim of Retaliatory Discharge in
   Violation of First Amendment Right to Free Speech as
   against Defendants Peck and Mitchell, in their
   individual capacities;

---

[8] Plaintiffs' Complaint, [D.E. #1], pleads two separate claims for § 1983
violation of liberty interest and procedural due process under the United States
Constitution.   However, as there are no property interests in plaintiffs'
employment, it is alleged deprivation of their liberty interests that is the
subject of their procedural due process claims.

59

3. Claim Three – Plaintiff Conner's Claim of Breach of Contract as against Village;

4. Claim Five – Libel as against Defendants Peck, Mitchell, in their individual capacities, and as against Village;

5. Claim Six – Violation of the North Carolina Constitutional Right to Privacy as against Village; and

6. Claim Seven – Wrongful Discharge as against Village.

This __22nd__ day of June 2017.

Malcolm J. Howard
Senior United States District Judge

At Greenville, NC
#35