IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:15-CV-187-H

THOMAS CANNON, JESSE CONNER,       )
DONALD KOONS, and NICHOLAS         )
TERRELL,                           )
     Plaintiffs,                   )
                                   )
     v.                            )
                                   )
VILLAGE OF BALD HEAD ISLAND,       )    **FINDINGS OF FACT AND**
NORTH CAROLINA, CALVIN R.          )    **CONCLUSIONS OF LAW**
PECK, JR., in his individual       )
capacity, and CAROLINE             )
MITCHELL, in her individual        )
capacity,                          )
     Defendants.                   )


     A bench trial of the above captioned case was conducted by the undersigned at the United States District Court in Greenville, North Carolina, on September 8 and 9, 2020. This matter comes before the court on claims arising from defendants' termination of the plaintiffs' employment. The claims, as detailed below, include deprivation of plaintiffs' liberty interest in violation of the Due Process Clause of the Fourteenth Amendment; libel per se; libel per quod; wrongful discharge; and breach of contract. After taking the matter under advisement, the court makes the following findings of fact and conclusions of law.

## I.  Findings of Fact

### General Findings

1.  Plaintiffs Thomas Cannon, Jesse Conner, Donald Koons, and Nicholas Terrell are former public safety officers with the Department of Public Safety of the Village of Bald Head Island ("the Village"), a municipality located in Brunswick County, North Carolina.

2.  Defendant Calvin Peck ("Defendant Peck"), at all times relevant to the events of the complaint, was the Manager for the Village.

3.  Defendant Caroline Mitchell ("Defendant Mitchell"), at all times relevant to the events of the complaint, was the Director of Public Safety for the Village.

4.  The Village's Public Safety Department is a small department, with a total staff of approximately 20 full-time officers.  Since approximately 2010, the Public Safety Department's officers have been required to be cross-trained to provide law enforcement, fire, and emergency medical services to the Village of Bald Head Island.

5.  Plaintiff Thomas Cannon ("Plaintiff Cannon") began working for the Village in August of 2009.  He was a Lieutenant Public Safety Officer at the time of termination.  Prior to being employed by the Village, Plaintiff Cannon's employment history included working on his family farm, being a concrete contractor, owning a construction company, serving as a firefighter, and serving as a firefighter in Iraq in 2006.

6.  Plaintiff Jesse Conner ("Plaintiff Conner") began working for the Village in late 2012.  He was a Public Safety Officer at the time of termination. He became a certified law enforcement officer in 2014.  Prior to being employed by the Village, Plaintiff Conner had been a firefighter and paramedic.

7.  Plaintiff Donald Koons ("Plaintiff Koons") began working for the Village in August of 2012.  He was a Public Safety Officer at the time of termination. Prior to being employed by the Village, Plaintiff Koons was employed as a police officer with Leland Police Department.

2

8. Plaintiff Nicholas Terrell ("Plaintiff Terrell") began working for the Village in September of 2009. He was a Lieutenant Public Safety Officer at the time of termination. Prior to being employed by the Village, Plaintiff Terrell was employed with New Hanover Regional EMS and Leland Fire and Rescue.

9. At the time of their termination on August 28, 2014, all plaintiffs had received positive annual reviews and had not been subject to any prior discipline.

### Terminations

10. On August 28, 2014, Plaintiffs Conner, Koons, and Terrell were respectively summoned to individual meetings with Defendants Peck and Mitchell and terminated from their positions, effective immediately. Each plaintiff was presented a letter, signed by Defendant Peck, which indicated that plaintiff's conduct in communications during the period from July 25, 2014 to August 15, 2014 violated certain provisions of Village Policy. Plaintiffs were not provided a copy of the alleged communications at issue at that time. (Pls.' Ex. 9 – Conner Termination Letter; Ex. 10 Koons Termination Letter; Ex. 11 Terrell Termination Letter).

11. Plaintiffs Conner, Koons, and Terrell were told to turn in their badges, making their terminations final.

12. At his termination meeting, plaintiff Conner was provided a letter of termination signed by Defendant Peck that gave as the reasons for termination a violation of Defendant Village's written policies related to "discourteous treatment of other employees, (Article IX), and inappropriate electronic communications (Article IX)." (Pls.' Ex. 9 – Conner Termination Letter).

13. At his termination meeting, Plaintiff Koons was provided a letter of termination signed by Defendant Peck which terminated him for "harassment and sexual harassment (Article V: Conditions of Employment and Article IX), discourteous treatment of other employees (Article IX), and inappropriate electronic communications (Article IX)." (Pls.' Ex. 10 – Koons Termination Letter). Plaintiff Koons' termination letter also noted, "[t]he Village of Bald Head Island

3

has no tolerance for harassment."

14. At his termination meeting, Plaintiff Terrell was provided a letter of termination signed by Defendant Peck which terminated him for "harassment and sexual harassment (Article V: Conditions of Employment and Article IX), discourteous treatment of other employees (Article IX), and inappropriate electronic communications (Article IX)." (Pls.' Ex. 11 – Terrell Termination Letter). Plaintiff Terrell's termination letter also provided "[t]he Village of Bald Head Island has no tolerance for harassment and especially those in leadership positions are expected to not only abide by policy, but to assist in upholding the principles and policies of the Village."

15. Plaintiff Cannon was not physically present in the Village on August 28, 2014. He was called later that same day and terminated over the phone.

16. Plaintiff Cannon was provided his letter of termination by certified mail, which indicated that his conduct in communications during the period from July 25, 2014 to August 15, 2014 violated certain provisions of Village Policy.[1] The letter was signed by Defendant Peck and terminated him for "harassment (Article V: Conditions of Employment and Article IX), discourteous treatment of other employees (Article IX), and inappropriate electronic communications (Article IX)." (Pls.' Ex. 8 – Cannon Termination Letter). Plaintiff Cannon's termination letter also noted, "[t]he Village of Bald Head Island has no tolerance for harassment and especially those in leadership positions are expected to not only abide by policy, but to assist in upholding the principles and policies of the Village." Id.

17. All four termination letters further provided, "[t]he egregious nature of these communications and the flagrant violation of policy thus constitutes detrimental personal conduct[,] and is thereby grounds for immediate termination." (Pls.' Exs. 8-11).

---

[1] Plaintiff Cannon only took part in communications on July 25, 2014.

4

## Publication of Termination Letters

18. The next day, on the morning of August 29, 2014, Dr. Karen Williams, the Director of both Human Resources and Communications for the Village, provided the plaintiffs' termination letters to multiple news outlets after numerous requests. (See, e.g., Pls.' Ex. 26 – 8/29 Star News Article). Some of the publications did not distinguish among plaintiffs when stating alleged violations of Village policy.

19. Plaintiff Cannon's termination letter was also published on August 29, 2014, with the other plaintiffs' letters, before he even received it in the mail.

## Hearing Requests

20. On the afternoon of August 29, 2014, Dr. Karen Williams told Defendant Peck she needed to do an investigation and he told her "that ship has sailed, it's time to stand down and move on. It is too late now."

21. On the same day, August 29, 2014, Plaintiffs Conner, Koons, and Terrell each sent letters to Defendant Peck asking for an appeal of the termination because "the grounds for which [he] was terminated were unfair and that [his] job performance and personal conduct were not accurately represented." (Pls.' Ex. 15 – Conner Appeal Letter; Pls.' Ex. 17 – Koons Appeal Letter; Pls.' Ex. 19 – Terrell Appeal Letter).

22. Plaintiff Cannon never submitted a request for a grievance or appeal hearing.

23. Defendant Peck responded on September 3, 2014, to Plaintiff Conner, Koons, and Terrell's letters individually, that "[e]mployment with the Village of Bald Head Island is 'at-will' and as such can be terminated for any reason or for no reason. There is no right to a grievance or appeal process." (Pls.' Ex. 16 – Response to Conner grievance letter; Pls.' Ex. 18 – Response to Koons grievance letter; Pls.' Ex. 20 – Response to Terrell grievance letter).

## Creation and Publication of Forms F-5B

24. On or about September 8, 2014, Defendant Mitchell completed and signed before a notary a Form F-5B,

5

also known as a Report of Separation, regarding the plaintiffs' terminations. (Pls.' Ex. 22 – Cannon Form F-5B; Pls.' Ex. 23 – Conner Form F-5B; Pls.' Ex. 24 – Koons Form F-5B; Pls.' Ex. 25 – Terrell Form F-5B).

25. The Form F-5B has a section entitled "Reason for Separation," which provides for a box to check if the agency is (or is not) "aware of any investigations in the last 18 months concerning potential criminal action or potential misconduct by this officer." The Form F-5B then asks for a "detailed description of reasons for the investigation."

26. For each of the plaintiffs, Defendant Mitchell checked the box indicating that the agency "IS aware of any investigation(s) in the last 18 months concerning potential criminal action or potential misconduct by this officer." (Pls.' Ex. 22, 23, 24, 25).

27. The Forms F-5B for Plaintiffs Cannon, Conner, Koons, and Terrell then provide as follows in the section for a "detailed description of reasons for investigation," "[a] complaint was filed with this agency regarding this Officer and several others involving inappropriate electronic communications that created a hostile work environment in violation of Village Policy." (Pls.' Ex. 22 – Cannon Form F-5B; Pls.' Ex. 23 – Conner Form F-5B; Pls.' Ex. 24 – Koons Form F-5B; Pls.' Ex. 25 – Terrell Form F-5B).

28. Forms F-5B must be sent to Training Standards within 10 days after a certified law enforcement officer ceases to work for a police department in North Carolina. Form F-5Bs are reviewed to determine whether an officer should be certified to continue working as a law enforcement officer when he or she seeks employment with a subsequent law enforcement agency.

29. The Forms F-5B were both available to employers and the common practice of a law enforcement agency is to request from Training Standards Commission the Forms F-B for an applicant during the background check. Plaintiffs Cannon and Koons both had to go through this process to obtain recertification as law enforcement officers after their Forms F-5B were requested. Plaintiffs Conner and Terrell did not

6

apply for law enforcement officer jobs as they knew their Form F-5B would be requested.

30. In accordance with the above requirement, the Forms F-5B were provided to The North Carolina Criminal Justice Education and Training Standards Commission where they are available to any potential law enforcement employer of Plaintiffs.

31. Officer Nick Hiatt was employed with the Village as a Public Safety Officer from July 2013 to May 2015 and worked with Plaintiffs Cannon, Conner, Koons, and Terrell.

32. Defendant Mitchell testified at trial that Officer Nick Hiatt was the complainant she referred to in the Form F-5B and she construed Lieutenant Matthew Cox to be a complainant as well.

33. However, the court finds Officer Hiatt was not offended and did not intend his actions to be a "complaint." Officer Hiatt was not a complainant.

34. Based on Matt Cox's testimony, the court finds that he had not read the text messages, was not offended by the text message exchange, and did not make a complaint to Defendant Mitchell about them.

35. Officer Hiatt <u>had</u> mentioned the text messages to Lieutenant Cox on a ferry ride, prior to the time that the plaintiffs were terminated, but it was a brief conversation in which Lieutenant Cox told Officer Hiatt to "recuse himself" from the conversation.

36. The court finds Lieutenant Matt Cox was also not a complainant. He testified that after learning that he was considered a complainant, he informed Defendant Mitchell he was not a complainant.

37. Matt Cox witnessed off-color or R-rated jokes made in the Public Safety Department as a common occurrence including one made by Director Mitchell. He did not complain as he felt that in context it was a joke.

38. Plaintiff Cannon's Form F-5B was requested by future employers to which he applied after termination, including Beech Mountain Police Department and Sparta Police Department.

39. Plaintiff Conner's Form F-5B was not requested by Oak Island because he applied there as a firefighter

7

and paramedic, not as a law enforcement officer because he did not want the Form F-5B released.

40. Plaintiff Koons' Form F-5B was requested by Shallotte Police Department to which he applied after termination.

41. Plaintiff Terrell's Form F-5B was not requested by Oak Island because he also sought employment as a firefighter and paramedic rather than as a law enforcement officer because he did not want the Form F-5B form released.

### Text Messages – Two Chains

42. The court incorporates by reference the text messages admitted into evidence at trial. [Pls.' Ex. 30a – Text Messages].

43. The text messages at issue are contained within two separate text message chains. (Pls.' Ex. 30a – Text Messages).

44. The first chain is dated July 25, 2014 and consists of the first three pages of Exhibit 30a.

45. The second chain is dated August 6, 2014 to August 15, 2014 and consists of the remaining 23 pages of Exhibit 30a.

46. The text messages were sent on the plaintiffs' private, personal phones and were sent when the plaintiffs were off-duty.

47. Plaintiff Cannon sent one text in the first text chain and was not part of the second text chain. He therefore neither sent nor received any texts from the second chain.[2]

48. Defendant Peck and Defendant Mitchell testified that they did not know until the trial that Plaintiff Cannon only participated in the first text chain.

### Text Messages – Content

49. The text messages themselves included jokes, in the form of text and photos, internet memes and movie

---

[2] Plaintiff Cannon sent a photo message and a text message, "Sammy getting his hands dirty! Of course there was a young female involved," along with a photo of a person fixing a bicycle. [Pls.' Ex. 30a at 1].

references, many of which were sent by Officer Jeff Sypole and not the plaintiffs.[3]

50. No credible evidence was produced that Officer Hiatt, Lieutenant Cox, or any party to the text message exchanges, was offended, upset, or felt picked on, or harassed, sexually or otherwise.

51. There was no evidence presented that anyone's work performance was affected by either text message chain.

52. Plaintiffs Conner, Koons, and Terrell expressed concerns in the text messages regarding the lack of training and leadership impacting public safety.[4] (Pls.' Ex. 30a – text messages). They had also expressed concerns outside of the text messages about the lack of training and leadership impacting public safety.

53. Plaintiffs' texts also related to statements made by Defendant Mitchell to a local newspaper about public safety officer training.[5]

---

[3] The text message thread also included a number of crude sex jokes, including comments about homosexual sex acts, penis sizes, men wearing bikini underwear, and men's anatomy. For example, two separate text messages regarding a plaintiff stated as a joke, ("he's been in the office taking a pounding," and "if dicks had wings, [his] mouth would be an airport"). The former message was sent by plaintiff Koons and the latter message was sent by an officer who is not a party to the lawsuit.

[4] Plaintiff Conner wrote "I like how were (sic) worried about sending people to county check points but not worried that people who claim to be ems can't take a blood pressure. Or not worried about doing first in engine drills or even sending guys who have no real fire experience at least to a controlled training burn."
Plaintiff Koons wrote "In Colorado u do not need [certifications] u do what ever u want just like bald head."
Plaintiff Terrell wrote, "How about some fire or EMS training." He also wrote about what he considered to be an unqualified officer promoted to leadership "Ask her what your plan of attack is when you get a fire or what you guys should do when you get a bad medical. Oh yea also what's her plan when you guys get that water rescue call. She didn't help your shift she just hurt it and she should have the integrity to say so." (Exhibit 30A – text messages).

[5] First referenced and then posted to the group chat by Officer Bryant, the article, based on information from Defendant Mitchell, stated that all but two public safety officers at the Village were trained in all four applicable disciplines.
Plaintiff Conner wrote, "Hey. If everyone but two are all 4 certs then why are only a hand full of the staff doing ems fire and water rescue?" Plaintiff Koons wrote regarding the article "This is getting out of control over."
Plaintiffs and their co-workers knew the statements in the article were false.

9

54. The termination letters for Plaintiffs Koons and Terrell found them in violation of Article V: Conditions of Employment of the Defendant Village's Personnel Policy for sexual harassment. (Pls.' Ex. 10 – Koons termination letter; Pls.' Ex. 11 – Terrell termination letter).

55. The Personnel Policy defines sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when 1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; 2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or 3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." (Pls.' Ex. 7 Personnel Policy at 24).

56. The published termination letters for Plaintiffs Cannon, Koons and Terrell found them in violation of Article V: Conditions of Employment of the Defendant Village's Personnel Policy for harassment. (Pls.' Ex. 8 – Cannon termination letter; Pls.' Ex. 10 – Koons termination letter; Pls.' Ex. – Terrell termination letter).

57. The Personnel Policy defines harassment as "verbal or physical conduct that denigrates of (sic) shows hostility or aversion toward an individual because of his or her race, color, religion, gender, national origin, age, or disability, or that of his or her relatives, friends, or associates." (Pls.' Ex. 7 Personnel Policy at 24).

58. The published termination letters for Plaintiffs Cannon, Conner, Koons, and Terrell found them in violation of Article IX of the Defendant Village's Personnel Policy for inappropriate electronic communications (Pls.' Ex. 8 – Cannon termination letter; Pls.' Ex. 9 – Conner termination letter; Pls.' Ex. 10 – Koons termination letter; Pls.' Ex. 11 – Terrell termination letter).

59. The Personnel Policy, Article IX Section 9, defines Inappropriate Electronic Communications as "electronic communications or website-postings, accessible via the internet or other media outlet, which negatively reflect upon the Village or contain inappropriate comments, images or conduct." (Pls.' Ex. 7 Personnel Policy at 46).

60. The text messages at issue were accessed from the physical phone of Nick Hiatt by David Cox, an Information Technology employee of Defendant Village.

61. The text messages were not accessible via the internet or other media outlet.

62. The published termination letters for Plaintiffs Cannon, Conner, Koons and Terrell found them in violation of Article IX of the Defendant Village's Personnel Policy for "discourteous treatment of other employees" and "[t]he egregious nature of these communications and the flagrant violation of policy thus constitutes detrimental personal conduct and is thereby grounds for immediate termination." (Pls.' Ex. 8 – Cannon termination letter; Pls.' Ex. 9 – Conner termination letter; Pls.' Ex. 10 – Koons termination letter; Pls.' Ex. 11 – Terrell termination letter).

63. The Personnel Policy, Article IX Section 2, defines Unsatisfactory Job Performance as including "any aspect[s] of the employee's job which are not performed as required to meet the standards set by the Department Head (including written performance standards, verbal performance coaching, and performance review discussions. Examples of unsatisfactory job performance include, but are not limited to, the following: … "d) Discourteous treatment of the public or other employees." (Pls.' Ex. 7 Village Personnel Policy at 44).

64. The Personnel Policy, Article IX Section 1, provides "Disciplinary Action for Unsatisfactory Job Performance" as follows: "[a] regular employee may be placed on disciplinary suspension, demoted, or dismissed for unsatisfactory job performance, if after following the procedure outlined below, the employee's job performance is still deemed to be unsatisfactory. All cases of disciplinary suspension, demotion, or dismissal must be approved

11

by the Village Manager prior to giving notice to the employee." (Pls.' Ex. 7 Personnel Policy at 44).

65. The Personnel Policy, Article IX Section 5, defines "detrimental personal conduct" as including "behavior of such a serious detrimental nature that the functioning of the Village may be or has been impaired; the safety of persons or property may be or ha[s] been threatened; or the laws of any government may be or have been violated." (Pls.' Ex. 7 Village Personnel Policy at 45).

66. The Personnel Policy, Article IX Section 4 entitled "Disciplinary Action for Detrimental Personal Conduct," provides "[w]ith the approval of the Village Manager, an employee may be placed on disciplinary suspension, demoted, or dismissed without prior warning for causes relating to Detrimental Personal Conduct or Inappropriate Communications to 1) avoid disruption of work; 2) protect the safety of persons or property; 3) protect the goodwill and reputation of the Village or 4) for other serious reasons." (Pls.' Ex. 7 Village Personnel Policy at 45).

**Defendant Mitchell's Meeting with Officer Hiatt**

67. Defendant Mitchell first became aware of the text message chains while meeting with Officer Nick Hiatt regarding an unrelated incident.

68. Hiatt showed a text message on his phone from one of the text chains at issue to Defendant Mitchell about an officer's promotion to lieutenant, because he did not think "that she was fit for the duties of the lieutenant's position and [he] was expressing [his] concern, along with everybody else's." [DE #152 at 102].

69. After a lawsuit was filed against Defendant Village, Defendant Mitchell told Hiatt to watch his comments to anybody regarding the firing since he was the "complainant." He responded by telling her he was not a complainant about any of the text messages that led to the firing of plaintiffs.

## Defendant Mitchell's Meeting with Captains

70. After the IT Director retrieved the text message chains from the cell phone, Mitchell met with three other members of her command staff, Capt. Shawn Freeman, Capt. Scott Anderson, and Capt. Paul Swanson and discussed the termination of plaintiffs based upon text messages.

71. Defendant Mitchell felt that the text message exchange demonstrated that the officers involved disrespected their superiors.

72. Captain Anderson supported termination based on a photo or "meme" of Defendant Mitchell with the message that he remembered said "something along the lines of, is this a man or a woman" that was included in the text message chain; however, Captain Anderson did not know and was not told that this meme was sent by Officer Jeff Sypole, not any of the plaintiffs.

73. Captain Anderson did not know and was not told that there were two separate text chains nor did he know Plaintiff Cannon did not text or receive texts on the second text chain.

74. The court finds Captain Anderson recommended termination based on his understanding of what Defendant Mitchell wanted, as he testified at trial that he "knew how [Defendant Mitchell] felt and [he] followed and supported my commander."

75. Captain Anderson testified that at the time of his deposition, he stated "I'm going to [be] honest, I felt like, thinking back, that the decision had already been made, she was just using us to confirm what she wanted to do."

76. At trial he stated that those were his words from his deposition but that at the time of trial, "it's hard to know whether or not the decision had been premade but the decision was made, obviously."

77. At the meeting with Defendant Mitchell, Captain Freeman was shown one or two of the text messages from Exhibit 30a on the phone.

78. Captain Freeman was opposed to termination. He believed plaintiffs did not break any policy in the

Personnel Policy, and he told Defendant Mitchell that prior to plaintiffs' terminations.[6]

**Defendant Mitchell's Meeting with Defendant Peck**

79. After meeting with her command staff, Defendant Mitchell met with Defendant Peck about the matter. Defendant Mitchell told Defendant Peck that the text messages had come to her attention when one of the employees in the Public Safety Department complained about them.

80. Defendant Mitchell also told Defendant Peck that after meeting with the command staff at the Public Safety Department, they had reached a consensus to recommend to Defendant Peck that Plaintiffs Cannon, Conner, Koons and Terrell should be terminated.

81. After reviewing the text messages, Defendant Peck agreed with Defendant Mitchell's recommendation that the officers should be terminated.

82. Defendant Peck did not know until trial that Plaintiff Cannon only sent one text message and one photo on one day on the first text chain.

83. Defendant Peck believed that the overall tone of the text message exchange displayed a clear tone of hostility and insubordination toward Defendant Mitchell and other members of the command staff at the Public Safety Department. In particular, Defendant Peck felt that it was obvious from the text messages that the officers had no respect for the superior officers in their chain of command. Defendant Peck also believed that some of the comments were directed at Defendant Mitchell because of her sexual orientation, which he also found offensive.

84. The court finds Defendant Peck terminated plaintiffs because he believed they were jerks and disrespectful of the chain of command, not for the reasons stated in the termination letters.[7]

---

[6] Captain Freeman testified that at the time of plaintiffs' termination he "felt like what they were being dealt was not appropriate and, you know, [he] felt like [he] needed to stand up for that, which didn't really matter."

[7] Defendant Peck testified at trial, affirmatively when asked, "[a]nd you fired Tom Cannon, Jesse Conner, DJ Koons, and Nick Terrell because they were jerks and disrespectful to the chain of command, correct?" [DE #152 at 199-200].

85. The court finds based on Defendant Mitchell's testimony at trial, that she recommended firing Cannon in his role as lieutenant for being a participant in the text messages that she believed did not create a culture of supporting the team, although she did not understand that he sent two text messages on one day. Defendant Mitchell also testified she thought the text messages were disrespectful to the chain of command. [DE #153 at 158].

86. This meeting between Defendants Peck and Mitchell occurred within days prior to plaintiffs' termination. [DE #152 at 216].

87. Five additional employees of the Department were on the text chains and not terminated.

88. Because they did not investigate the text chains, Defendant Peck and Defendant Mitchell did not know until the trial that Plaintiff Cannon only participated in the first text chain.

89. The decision to terminate plaintiffs was ultimately Defendant Peck's but he based his decision on the recommendation of the Director of the Public Safety Department, Defendant Mitchell. [DE #152 at 193-94].

**Preparation of Termination Letters**

90. After discussing the matter with Defendant Mitchell, Defendant Peck directed Dr. Karen Williams, HR Director, to prepare termination letters for each of the Plaintiffs.

91. Defendant Peck's real reasons for termination of plaintiffs were different than the termination letters he signed.

92. At trial, Defendant Peck could not explain why Plaintiffs Koons and Terrell were terminated for sexual harassment, but plaintiffs Cannon and Conner were not.

93. He was aware that the termination letters he signed were public records and would have to be provided to anyone who requested them.

## Offer of Grievance Hearing

94. On September 30, 2016, over two years after the termination of plaintiffs, and subsequent to the filing of the lawsuit, Village Manager Chris McCall sent each of the plaintiffs a letter offering them the option of participating in a grievance hearing pursuant to the Village's Personnel Policy. (Letters from C. McCall to Plaintiffs, Defs' Exhibit 207).

## Plaintiff Cannon's Employment Sought After Termination

95. Plaintiff Cannon was paid $24.73 per hour at the time he was terminated from Defendant Village and worked approximately 171.5 hours per month. He also paid law enforcement pension contributions and received health insurance.

96. Plaintiff Cannon applied for over a dozen jobs since being terminated. He was employed for two weeks as a forklift driver and is currently working one or two days a week as a letter carrier for the United States Postal Service.

97. Plaintiff Cannon has received $600 per month in law enforcement retirement benefits and $240 per month in a special separation allowance since being terminated.

98. Cannon was seeking to retire in the period right before he was terminated and had indicated that he was going to apply for the statutory Special Separation Allowance.

99. Cannon was ultimately recertified by Training Standards as a law enforcement officer because he knew Captain Freeman at Beech Mountain Police Department, who became Chief Freeman at Beech Mountain and vouched for Plaintiff Cannon to be hired as a reserve officer despite the information contained in his Form F5-B and the termination letter.[8] After becoming recertified, Cannon did not

---

[8] Captain Freeman left the Village in November 2014 due to his lack of agreement with the way in which terminations of plaintiffs were conducted. He is the Chief of Black Mountain Police Department as of the time of trial.

work for Beech Mountain but became a reserve officer for the Town of Sparta, North Carolina to maintain his certification.

100. Plaintiff Cannon has sold some of his real property in order to provide for his family and additionally has experienced significant distress emotionally as a result of the publication.

**Plaintiff Conner's Employment Sought After Termination**

101. Plaintiff Conner testified that, subsequent to his terminations from Bald Head Island, he has not applied for any law enforcement jobs and his certification as a law enforcement officer has expired.

102. Plaintiff Conner was paid $21.38 per hour at the time he was terminated from Defendant Village and worked approximately 171.5 hours per month. He also paid law enforcement pension contributions and received health insurance.

103. Plaintiff Conner obtained employment as a firefighter and paramedic at the Town of Oak Island in October of 2014 and was still employed in the same position at the time of trial. Plaintiff Conner's pay history at the Town of Oak Island is:

   a. $12.83 per hour at hiring.

   b. $13.48 per hour beginning October 2015;

   c. $13.88 per hour beginning October 2016;

   d. $14.34 per hour beginning October 2017;

   e. $15.02 per hour beginning October 2018; and

   f. $15.49 per hour beginning October 2019 and

   g. $15.81 at the time of trial.

   h. Despite six years between Plaintiff Conner's termination from Defendant Village and trial, Plaintiff Conner, as of trial, makes $5.57 per hour less per hour then at the time of his termination from Defendant Village.

104. Plaintiff Conner works 240-260 hours per month at the Town of Oak Island, compared to the 171.5 hours he worked per month for Defendant Village.

105. In addition to lost wages and earning capacity, Plaintiff Conner has been diagnosed by a medical

17

professional with Post Traumatic Stress Disorder arising from the publication of his termination letter.

106. Plaintiff Conner was able to obtain his current employment because of a close personal relationship with a senior leader at the Town of Oak Island Fire Department.

107. Plaintiff Conner has not applied for a law enforcement job based on his belief that he would not be able to obtain employment, without a personal connection in his chosen field, due to the false, stigmatizing statements made by the Defendants in both Plaintiff Conner's termination letter and Form F-5(b).

108. In order to truthfully and accurately describe to any potential employer the reasons given for his termination from Defendant Village, Plaintiff Conner would have to tell them the reasons given in his termination letter and his Form F-5B.

**Plaintiff Koons' Employment Sought After Termination**

109. Plaintiff Koons was paid $18.03 per hour at the time he was terminated from Defendant Village and worked approximately 171.5 hours per month. He also paid law enforcement pension contributions and received health insurance.

110. Plaintiff Koons applied for, and was denied, many jobs after his termination from Defendant Village. Plaintiff Koons had to disclose the reason for which he was terminated in the Form F-5(b).

111. Plaintiff Koons was unable to obtain employment for about a year after his termination, when he was hired by the Shallotte Police Department.

112. In order to gain employment at the Shallotte Police Department, Plaintiff Koons underwent the following:

   a. Plaintiff Koons worked 240 hours of unpaid time at the Shallotte Police Department as a "trial."

   b. Plaintiff Koons was investigated by Criminal Justice Education and Training Standards Commission of North Carolina;

   c. Plaintiff Koons' friend and former co-worker, John Hollman, vouched for Plaintiff Koons.

d. Plaintiff Koons, and his supervising Captain at Shallotte Police Department, submitted written statements to Criminal Justice Education and Training Standards Commission of North Carolina regarding the events at Defendant Village and Plaintiff Koons' actions during his 240 hours of "trial" work at the Shallotte Police Department.

113. Once Plaintiff Koons began being paid, he was initially paid $16.04 per hour and worked 169 hours per month.

114. Plaintiff Koons began getting paid more than he was paid at Defendant Village in 2017. He testified that he was paid $20.63 per hour in 2017.

115. In addition to lost wages and diminished earning capacity, Plaintiff Koons has suffered embarrassment in his community as a result of the false statements in his termination letter and Form F-5(b).

**Plaintiff Terrell's Employment Sought After Termination**

116. Plaintiff Terrell testified that, subsequent to his terminations from Bald Head Island, he has not applied for any law enforcement jobs and his certification as a law enforcement officer has expired.

117. Plaintiff Terrell was paid $24.35 per hour at the time he was terminated from Defendant Village and worked approximately 171.5 hours per month. He also paid law enforcement pension contributions and received health insurance.

118. Plaintiff Terrell applied for work with the New Hanover County Fire Department but was rejected from the position.

119. Plaintiff Terrell obtained employment as a firefighter and paramedic at the Town of Oak Island in October of 2014. Plaintiff Terrell pay history at the Town of Oak Island was:

i. $12.83 per hour at hiring;

j. $13.15 per hour six months later after completion of his probationary term of employment, approximately April 2015;

k. $13.47 per hour when he became a full-time employee beginning September 2015;

19

l. $13.74 per hour beginning October 2016;

m. $14.20 per hour beginning October 2017;

n. $14.51 per hour due to Cost of Living Allowance ("COLA") increase in 2018;

o. Plaintiff Terrell reduced his hours at Oak Island in September 2018 in order to start a painting and drywall business;

p. When Plaintiff Terrell left Oak Island in May 2019, his rate of pay was $14.51 per hour.

120. Plaintiff Terrell worked 230-260 hours per month at the Town of Oak Island, compared to the 171.5 hours he worked per month for Defendant Village, until he went part time in September of 2018.

121. Plaintiff Terrell also worked part time at New Hanover County Fire and Rescue at a rate of pay of $10 per hour.

122. Plaintiff Terrell is self-employed with a painting and drywall business and did not provide evidence of income information at trial.

123. In addition to lost wages and earning capacity, Plaintiff Terrell testified that he became very depressed after the loss of his job and because of the allegations and job loss, he experienced significant marital strife.


## II. <u>Conclusions of Law</u>

### <u>Liberty Interest</u>

#### Defendant Peck

1. The court finds by a preponderance of the evidence that Defendant Peck, in his individual capacity, deprived each of the plaintiffs of their liberty interest in violation of the 14th Amendment of the United States Constitution.

   a. The charges in the termination letters, as outlined above, placed a stigma on the reputation of each plaintiff; were made public by the employer as they were published to media the day after the terminations; were made in conjunction with the termination as the letters were provided at the

20

termination meetings and mailed after Plaintiff Cannon's termination phone call; and were false, as the reasons for termination in the plaintiffs' letters contradicted Defendant Peck's testimony of his reasons for termination and also contradicted the definitions of the Village Personnel Policy.[9]

b. The court finds by a preponderance of the evidence, a name-clearing hearing was denied to all plaintiffs.[10]

   i. In the termination meetings with Plaintiffs Conner, Koons, and Terrell, and in the termination phone call with Plaintiff Cannon, the plaintiffs were not given an opportunity or notice of any opportunity to appeal or file a grievance regarding the decision prior to the disclosure of the false, stigmatizing charges in the termination letters.

   ii. Defendant Peck wrote in response to the grievance letters of Plaintiffs Conner, Koons, and Terrell, that "[t]here is no right to a grievance or appeal process."

   iii. Plaintiffs were not offered a name-clearing hearing until more than two years after

---

[9] "[A] Fourteenth Amendment 'liberty interest is implicated by public announcement of reasons for an employee's discharge.'" Sciolino v. City of Newport News, 480 F.3d 642, 645-46 (4th Cir. 2007) (quoting Johnson v. Morris, 903 F.2d 996, 999 (4th Cir. 1990)). To succeed on a claim under the Due Process Clause for violation of this liberty interest, a plaintiff must first establish the charges against him: "(1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." Id. (citing Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 n.5 (4th Cir. 1988)).

[10] Second, a plaintiff must "demonstrate that [his] liberty was deprived without due process of law." Cannon v. Village of Bald Head Island, 891 F.3d 489, 501 (4th Cir. 2018) (quoting Segal v. City of N.Y., 459 F.3d 207, 213 (2d Cir. 2006). "To that end, the Supreme Court has recognized that, when a governmental employer places an employee's reputation 'at stake' by publicly disclosing defamatory charges, 'notice and opportunity to be heard are essential.'" Id. at 501-02 (quoting Bd. of Regents v. Roth, 408 U.S. 564, 573 (1972)). Indeed, "[f]undamental to due process is an opportunity to be heard — 'an opportunity which must be granted at a meaningful time.'" Sciolino, 480 F.3d at 653 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). "An opportunity to clear your name after it has been ruined by dissemination of false, stigmatizing charges is not 'meaningful.'" Id.

termination and publication of the false, stigmatizing charges, which offer was not made at a reasonable time to be "meaningful." Sciolino, 480 F.3d at 653 (citations omitted).

iv. As to Plaintiff Cannon, he was terminated by phone and the Termination Letter was published prior to his receipt of or knowledge of the contents of the letter, therefore he was denied notice and an opportunity to be heard.

### Defendant Mitchell

2. The court finds by a preponderance of the evidence that Defendant Mitchell, in her individual capacity, deprived each of the plaintiffs of their liberty interest in violation of the 14th Amendment of the United States Constitution.

a. The court finds by a preponderance of the evidence that the charges in the Forms F-5B as outlined above, placed a stigma on the reputation of each plaintiff; were published by the employer because they were available to potential employers and likely to be inspected by potential employers; were made in conjunction with termination because they were the forms completed based upon termination of the plaintiffs; and were false as Defendant Mitchell falsely claimed Officer Hiatt and Lieutenant Cox were complainants.

i. The forms were requested by potential employers of both Plaintiffs Cannon and Koons. Both plaintiffs had personal contacts that vouched for them to be rehired.[11]

ii. Plaintiffs Conner and Terrell did not apply for law enforcement jobs because they knew that their Forms F-5B would be requested and released to prospective law enforcement employers.[12]

---

[11] As to publication, there was a "substantial likelihood" that "the personnel file is available to prospective employers, and that those prospective employers not only have permission to, but are likely to, inspect the file." Sciolino, 480 F.3d at 650 n.5.

[12] "[T]o satisfy the public disclosure requirement 'an employee must allege (and ultimately prove) a likelihood that prospective employers (i.e., employers

22

b. The court finds by a preponderance of the evidence,
Defendant Mitchell[13] denied a name-clearing hearing to
Plaintiffs Cannon, Conner, Koons, and Terrell in
violation of due process.

**Libel Per Se**[14]

---

to whom he will apply) or the public at large will inspect the [stigmatizing]
file.'" <u>Cannon</u>, 891 F.3d at 503 (quoting <u>Sciolino</u>, 480 F.3d at 650). As the
Fourth Circuit found in <u>Sciolino</u>, a plaintiff can also satisfy this standard by
showing

[a] plaintiff can meet this standard in two ways. First, the
employee could allege (and ultimately prove) that his former
employer has a practice of releasing personnel files to all
inquiring employers. Second, the employee could allege that
although his former employer releases personnel files only to
certain inquiring employers, that he intends to apply to at least
one of these employers. In either case, he must allege that the
prospective employer is likely to request the file from his former
employer.

<u>Sciolino</u>, 480 F.3d at 650.

[13]In a separate cause of action arising out of the same set of facts and
brought by another terminated Village Public Safety Officer, Herbert Bryant,
the Fourth Circuit noted,

Although in <u>Cannon</u> we determined that Mitchell did not
properly raise her qualified immunity defense as to the
officers' due process claim before the district court,
she did adequately raise the defense below in this case.
However, we conclude that her drafting of the Form F-5B
and joint failure with Peck to offer Bryant a pre-
termination hearing precludes an award of qualified
immunity to Mitchell on Bryant's due process claim.

<u>Bryant v. Vill. of Bald Head Island</u>, 730 F. App'x 165, 166 (4th Cir. 2018)
(citing <u>Cannon</u>, 891 F.3d at 501 n.2 - 506); <u>see also Cannon</u>, 891 F.3d at 506

Accordingly, regardless whether the Fourteenth Amendment obliged
Defendants to afford the Officers an adversarial, *pre-termination*
name-clearing hearing, <u>Sciolino</u> established that the Fourteenth
Amendment required Defendants to afford the Officers a
constitutionally adequate name-clearing hearing before *publicly
disclosing* false information regarding the basis for the Officers'
termination that, in fact, restricted their ability to obtain new
employment.

[14]While plaintiffs alleged Village waived governmental immunity by the purchase
of liability insurance under N.C. Gen. Stat. § 160A-485, Village has denied
waiver. [DE #1 ¶12 and DE #37 ¶12]. As plaintiffs have brought forth no
evidence on this issue and therefore have not met their burden of proof on the
libel claims against Defendant Village, the libel per se and libel per quod

1. Termination Letters

    a. The court finds by a preponderance of the evidence that Defendant Peck committed libel per se[15] against Plaintiffs Cannon, Koons, and Terrell by publishing[16] termination letters which contained defamatory statements that were materially false.[17]

        i. Statements which were false and stigmatizing included the reasons for termination within Plaintiff Koons and Terrell's termination letters that their participation in text messages constituted "sexual harassment" and the reasons in Plaintiffs Cannon, Terrell, and Koons' termination letters that their participation in text messages constituted "harassment."

        ii. These statements were materially false in light of the actual reasons Defendant Peck provided in his deposition and at trial. Defendant Peck admitted the officers on the text message chain were terminated because he thought they were "jerks" and "disrespectful of the chain of command." Further, the court finds the text message chains do not meet the definitions of

---

claims against Defendant Village are dismissed. <u>See</u> <u>Mellon v. Prosser</u>, 126 N.C. App. 620, 623, 486 S.E.2d 439, 441–42 (1997), rev'd in part on other grounds, 347 N.C. 568, 494 S.E.2d 763 (1998) (citing <u>Whitaker v. Clark</u>, 109 N.C. App. 379, 384, 427 S.E.2d 142, 145 (1993)) (plaintiff bears the burden of showing waiver of immunity.)

[15] To prove a claim of defamation, a plaintiff must establish that "the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." <u>Boyce & Isley, PLLC v. Cooper</u>, 153 N.C. App. 25, 29, 568 S.E.2d 893, 897 (2002) (citing <u>Tyson v. L'eggs Products, Inc.</u>, 84 N.C. App. 1, 10–11, 351 S.E.2d 834, 840 (1987)).

[16] "Publication" for purposes of defamation, means that the defendant knowingly communicated the statement so that it reached one or more persons other than the plaintiff. <u>Taylor v. Jones Bros. Bakery, Inc.</u>, 234 N.C. 660, 662, 68 S.E.2d 313, 314 (1951), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u>, <u>Hinson v. Dawson</u>, 244 N.C. 23, 92 S.E.2d 393 (1956).

[17] The court finds Defendant Mitchell is not liable for the statements in the termination letter for Plaintiffs Cannon, Koons, and Terrell because the termination letters were drafted and signed by Defendant Peck.

these violations as found in the Personnel Policy.

b. The court finds the defamatory statements in the termination letters as detailed above, to be libelous per se.[18]

c. The court finds by clear and convincing evidence that Defendant Peck acted with actual malice.

   i. As to actual malice, the stated reasons for termination in the termination letters were "sexual harassment" and "harassment," and creation of a "hostile work environment."

   ii. Defendant Peck recklessly disregarded whether the reasons in the termination letters because he admitted he fired them because he believed "they were jerks."

2. Forms F-5B

   a. The court finds by a preponderance of the evidence that Defendants Mitchell committed libel per se against each plaintiff by publishing the Forms F-5B containing defamatory statements that were materially false.[19]

   b. The court finds by clear and convincing evidence that Defendants Mitchell did so with actual malice.[20]

---

[18] "[D]efamatory words to be libelous *per se* must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided." Broughton v. McClatchy Newspapers, Inc., 161 N.C. App. 20, 26, 588 S.E.2d 20, 26 (2003) (quoting Flake v. Greensboro News Co., 212 N.C. 780, 786, 195 S.E. 55, 60 (1938)).

[19] The court finds Defendant Peck is not liable for the statements in the Forms F-5B for Plaintiffs Cannon, Conner, Koons, and Terrell.

[20] "Actual malice is a subjective standard." Cannon, 891 F.3d at 507 (quoting Reuber v. Food Chem. News, Inc., 925 F.2d 703, 714 (4th Cir. 1991) (en banc)). "Although what constitutes '[r]eckless disregard . . . cannot be fully encompassed in one infallible definition,' the Supreme Court has 'emphasized the necessity for a showing that a false publication was made with a "high degree of awareness of . . . probable falsity."'" Id. (quoting St. Amant v. Thompson, 390 U.S. 727, 730-31 (1968)).

i. Nick Hiatt and Matt Cox were not complainants.

ii. As Defendant Mitchell was the self-described person to whom the alleged complaint was made and also was the author of the Forms F-5B, she had knowledge of the falsity. Finally, the definition of "inappropriate electronic communications" in the Village Personnel Policy required the communications to be available over the internet, which these text messages were not.

c. The court finds the defamatory statements in the Form F5-Bs, as detailed above, to be libelous per se.

## Libel Per Quod

1. The court finds by a preponderance of the evidence that Defendant Peck[21] committed libel *per quod* against Plaintiff Conner as the statements in Conner's termination letter that he was terminated for "inappropriate electronic communications," and "detrimental personal conduct" were intended to impeach him in his profession, were false, and were published.[22]

2. The court finds by clear and convincing evidence that Defendant Peck did so with actual malice.

   a. Defendant Peck was familiar with the Personnel Policy and knew the definitions of the terms or recklessly

---

[21] The court finds Defendant Mitchell is not liable for the statements in the termination letter of Plaintiff Conner because Defendant Peck wrote and signed Plaintiff Conner's termination letter.

[22] To prove defamation, plaintiff must show "that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's reputation." Griffin v. Holden, 180 N.C. App. 129, 133, 636 S.E.2d 298, 302 (2006) (quoting Smith-Price v. Charter Behavioral Health Sys., 164 N.C. App. 349, 356, 595 S.E.2d 778, 783 (2004)). "The publication must have been intended by defendant to be defamatory and had to be understood as such by those to whom it was published." Raymond U v. Duke Univ., 91 N.C. App. 171, 181, 371 S.E.2d 701, 708 (1988) (citing Robinson v. Ins. Co., 273 N.C. 391, 394, 159 S.E.2d 896, 899 (1968)). Relevant to the instant case, the defamatory statement "(1) must touch the plaintiff in his special trade or occupation, and (2) must contain an imputation necessarily hurtful in its effect on his business." Badame v. Lampke, 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955).

disregarded the definitions of the terms when he wrote the termination letter for Plaintiff Conner.

    b. Conner did not commit "Detrimental personal conduct" as stated in the letter. "Detrimental personal conduct" includes "behavior of such a serious detrimental nature that the functioning of the Village may be or has been impaired; the safety of persons or property may be or ha[s] been threatened; or the laws of any government may be or have been violated." (Pls.' Ex. 7 Village Personnel Policy at 46). The officers were messaging one another when they were off-duty and their job performance was unaffected. There was no threat to the safety of persons or property or violation of laws in their text messages.

3. Plaintiff Conner has proven special damages[23] by showing he was unable to obtain law enforcement employment after the publication of his termination letter and instead was employed as a firefighter and paramedic at Oak Island with significantly reduced pay. Additionally, Plaintiff Conner works 240-260 hours per month at the Town of Oak Island, compared to the 171.5 hours he worked per month for Defendant Village. In addition to lost wages and earning capacity, Plaintiff Conner has been diagnosed by a medical professional with Post Traumatic Stress Disorder arising from the publication of his termination letter.

## **Wrongful Discharge[24]**

1. The court finds that Plaintiffs Conner, Koons, and Terrell failed to prove their wrongful discharge claims against Defendant Village by a preponderance of the evidence.

2. Plaintiffs Conner, Koons, and Terrell participated in some conduct protected by law by speaking about public

---

[23] To prove a claim for libel per quod specifically, a plaintiff must allege and prove special damages, <u>Renwick v. News and Observer Pub. Co.</u>, 310 N.C. 312, 317, 312 S.E.2d 405, 408 (1984), as well as actual malice as the plaintiff is a public official. <u>Varner v. Bryan</u>, 113 N.C. App. 697, 703, 440 S.E.2d 295, 299 (1994) (quoting <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 279-80 (1964)).

[24] Plaintiff Cannon's wrongful discharge claim was precluded by the court's finding that Plaintiff Cannon's speech did not constitute protected conduct. [DE #136 at 33 (citing DE #72 at 41)].

safety, a matter of public concern. However, as the court noted above, Plaintiffs Conner, Koons, and Terrell also spoke on matters of private concern, and these matters were not protected.

3. Even if the court were to find that all of the conduct was protected by law, and that Plaintiffs Conner, Koons, and Terrell's participation in this conduct protected by law was a substantial factor in Defendant Village's decision to terminate the Plaintiffs, Defendant Village offered evidence at trial that it would have terminated plaintiffs even if they had not engaged in protected conduct.

4. Village would have terminated plaintiffs for the unprotected conduct, that is, namely the jokes that were exchanged as text messages, which Defendants Peck and Mitchell testified offended them.

5. Therefore, as Defendant Village offered evidence of a reason for termination other than for the messages on a matter of public concern, Plaintiffs Conner, Koons, and Terrell failed to prove their claims of wrongful discharge.

## Breach of Contract

1. As Plaintiff Conner introduced no evidence of the existence of a contract, the court finds no contract existed between Plaintiff Conner and Defendant Village.[25]

2. Therefore, Plaintiff Conner failed to prove his breach of contract claim.

## Damages

1. Compensatory damages are proper in § 1983 actions.[26]

---

[25] The court notes Plaintiff Conner himself testified that he "signed a contract for BLET training." [DE #153 at 42]. The parties agree that a BLET Training Agreement was executed between Defendant Mitchell and Plaintiff Conner, providing that Village would pay for Conner's BLET Training in exchange for Conner working for the Village, but there was no evidence presented at trial of an employment contract. [DE #1-6].

[26] Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 (1986) (in section 1983 actions, damages are typically "determined according to principles derived from the common law of torts" and are to compensate for the injury caused by defendant's breach.)

28

2. Therefore, the court has calculated compensatory damages in relation to the lost wages of each plaintiff against Defendants Peck and Mitchell.

3. Presumed damages[27] for libel per se are available for matters such as loss of reputation or standing in the community. Therefore, the court is awarding presumed damages for each plaintiff against each defendant, with the exception that Plaintiff Conner only has a libel per se claim against Defendant Mitchell.

4. Plaintiff Conner is entitled to presumed damages on his libel per quod claim against Defendant Peck.

5. Punitive damages may be assessed on libel claims when the plaintiffs have proven one of the statutory aggravating factors, namely fraud, malice, or "willful or wanton conduct" in addition to "actual malice."[28]

6. "Willful or wanton conduct" "focuses on a defendant's 'conscious and intentional disregard of and indifference to *the rights and safety of others*.' On top of that, 'willful or wanton conduct' requires an additional finding unnecessary for a showing of actual malice—specifically, that 'the defendant knows or should know' that the conduct 'is reasonably likely to result in injury, damage, or other harm.'"[29]

7. Defendant Peck consciously and intentionally disregarded the rights of the plaintiffs when he wrote and published the violations of Village Policy knowing that they were not the reasons for termination, and with knowledge that the publication would "reasonably likely result in" harm to plaintiffs.

8. Defendant Mitchell consciously and intentionally disregarded the rights of the plaintiffs when she wrote that a complaint was filed in the Forms F-5B

---

[27] <u>Dunn & Bradstreet, Inc. v. Greenmoss Builders, Inc.</u>, 427 U.S. 749, 760-61 (1985) (finding "courts for centuries have allowed juries to presume that some damage occurred from many defamatory utterances and publications.") (citation omitted).

[28] <u>Desmond v. News and Observer Publ'g Co.</u>, 375 N.C. 21, 71, 846 S.E.2d 647, 675 (N.C. 2020) (citing N.C. Gen. Stat. § 1D-15(a)).

[29] <u>Id.</u> (emphasis in original) (citations omitted).

when it was not true, and with knowledge that the publication would "reasonably likely result in" harm to plaintiffs.

9. Therefore, the court awards punitive damages to Plaintiffs Cannon, Conner, Koons, and Terrell against Defendants Peck and Mitchell for punitive damages on their respective libel claims.

**The court awards damages as follows:**

**I. Compensatory Damages**

    **a. Plaintiff Cannon**

    1. Compensatory damages for Defendant Peck and Defendant Mitchell's violation of plaintiff's liberty interest in the amount of $80,000.

    2. Presumed damages for Defendant Peck's libel of plaintiff in the amount of $25,000.

    3. Presumed damages for Defendant Mitchell's libel of plaintiff in the amount of $25,000.

    **b. Plaintiff Conner**

    1. Compensatory damages for Defendant Peck and Defendant Mitchell's violation of plaintiff's liberty interest in the amount of $89,000.

    2. Presumed damages for Defendant Mitchell's libel per se of plaintiff in the amount of $25,000.

    3. Presumed damages for Defendant Peck's libel per quod of plaintiff in the amount of $25,000.

    4. Special damages[30] for Defendant Peck's libel per quod of plaintiff in the amount of $1.

---

[30] To prevent double recovery for the same injury, Plaintiff Conner will be awarded lost wages only on his liberty interest claim.

### c. Plaintiff Koons

1. Compensatory damages for Defendant Peck and Defendant Mitchell's violation of plaintiff's liberty interest in the amount of $46,000.

2. Presumed damages for Defendant Peck's libel of plaintiff in the amount of $25,000.

3. Presumed damages for Defendant Mitchell's libel of plaintiff in the amount of $25,000.

### d. Plaintiff Terrell

1. Compensatory damages for Defendant Peck and Defendant Mitchell's violation of plaintiff's liberty interest in the amount of $92,000.

2. Presumed damages for Defendant Peck's libel of plaintiff in the amount of $25,000.

3. Presumed damages for Defendant Mitchell's libel of plaintiff in the amount of $25,000.

## II. Punitive Damages

### a.   Plaintiff Cannon

1. Punitive damages for Defendant Peck's libel of plaintiff in the amount of $25,000.

2. Punitive damages for Defendant Mitchell's libel of plaintiff in the amount of $25,000.

### b. Plaintiff Conner

1. Punitive damages for Defendant Peck's libel of plaintiff in the amount of $25,000.

2. Punitive damages for Defendant Mitchell's libel of plaintiff in the amount of $25,000.

### c. Plaintiff Koons

1. Punitive damages for Defendant Peck's libel of plaintiff in the amount of $25,000.

2. Punitive damages for Defendant Mitchell's libel of plaintiff in the amount of $25,000.

**d. Plaintiff Terrell**

1. Punitive damages for Defendant Peck's libel of plaintiff in the amount of $25,000.

2. Punitive damages for Defendant Mitchell's libel of plaintiff in the amount of $25,000.

## Conclusion

Therefore, relief is granted as to the following claims:

1. Plaintiffs Cannon, Conner, Koons, and Terrell's liberty interest claims against Defendants Peck and Mitchell in their individual capacities on plaintiffs' section 1983 claims for violations of their Due Process Rights under the Fourteenth Amendment.

2. Plaintiffs Cannon, Koons, and Terrell's libel per se claims against Defendants Peck and Mitchell.

3. Plaintiff Conner's libel per se claim against Defendant Mitchell.

4. Plaintiff Conner's libel per quod claim against Defendant Peck.

The following claims are dismissed:

1. Plaintiff Cannon, Conner, Koons, and Terrell's Wrongful Discharge claims against Defendant Village.

2. Plaintiff Conner's Breach of Contract claim against Defendant Village.

3. Plaintiff Cannon, Koons, and Terrell's Libel Per Se Claims against Defendant Village.

32

4. Plaintiff Conner's Libel Per Quod Claim against Defendant Village.


Based upon Findings of Fact and Conclusions of Law as set out herein, the summary of awards are as follows:

      a. Thomas Cannon
           i. Liberty Interest Damages:    $80,000
          ii. Libel Damages:               $50,000
        iii. Punitive Damages:           $50,000

             TOTAL:               $180,000

      b. Jesse Conner
           i. Liberty Interest Damages:    $89,000
          ii. Libel Damages:                $50,001
        iii. Punitive Damages:           $50,000

             TOTAL:               $189,001

      c. Donald Koons
           i. Liberty Interest Damages:    $46,000
          ii. Libel Damages:                $50,000
        iii. Punitive Damages:           $50,000

             TOTAL:               $146,000

      d. Nicholas Terrell
           i. Liberty Interest Damages:    $92,000
          ii. Libel Damages:                $50,000
        iii. Punitive Damages:           $50,000

             TOTAL:               $192,000


Plaintiffs are entitled to recover a total of $707,001 from Defendants Peck and Mitchell as detailed supra.

Any request for costs and attorney's fees shall be filed in accordance with Rule 54 of the Federal Rules of Civil Procedure.

The clerk is directed to enter judgment accordingly.  Interest
shall accrue at the post-judgment rate applicable on the date
of judgment. The clerk is directed to close this case.

This 30th day of November 2020.

Malcolm J. Howard
Senior United States District Judge

At Greenville, NC
#35